# United States Court of Appeals
## For the First Circuit

No. 07-2470

ROBERT J. WELCH,

Plaintiff, Appellant,

v.

CHRISTOPHER CIAMPA, individually and in his capacity as Police Chief of the Town of Stoughton, Massachusetts,TOWN OF STOUGHTON, MASSACHUSETTS, RICHARD LEVINE, individually and in his capacity as a Select Person for the Town of Stoughton, Massachusetts, JOHN KOWALCZYK, individually and in his capacity as a Select Person for the Town of Stoughton, Massachusetts, MANUEL CACHOPA, individually and in his capacity as Police Chief of the Town of Stoughton, Massachusetts,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. George A. O'Toole, Jr., U.S. District Judge]

---

Before
Torruella, Cudahy,[*] and Lipez,
Circuit Judges.

---

Hillary Schwab, with whom Harold L. Lichten and Pyle, Rome Lichten, Ehrenberg, & Liss-Riordan, P.C., was on brief for appellant.
Michele E. Randazzo, with whom Jackie Cowin and Kopelman and Paige, P.C., was on brief for appellee Town of Stoughton.
Valerie A. McCormack, with whom Stephen C. Pfaff and Louison, Costello, Condon & Pfaff, LLP, was on brief for appellees Christopher Ciampa, Manuel Cachopa, Richard Levine and John Kowalczyk.

---

[*]Of the Seventh Circuit, sitting by designation.

September 23, 2008

**CUDAHY, Circuit Judge**. Robert Welch, a police officer in the Town of Stoughton (the Town), filed this lawsuit against the Chief of Police, the former Police Chief, two members of the Town's Board of Selectmen (the Board) and the Town, alleging that the defendants impermissibly retaliated against him for exercising his rights under the First Amendment of the Federal Constitution. He also sought relief under a state whistleblower statute and under the common law theory of tortious interference with advantageous business relations. Welch appeals from the district court's grant of summary judgment for the defendants. We affirm in part and reverse and remand in part.

## I. Background

We set forth the facts in the light most favorable to Welch, the nonmoving party. Ramos-Santiago v. United Parcel Serv., 524 F.3d 120, 122 (1st Cir. 2008). Welch joined the Stoughton Police Department (the Department) in 1987, and in 1999 he was promoted to sergeant. The following year, he was made detective sergeant, the highest-ranking position in the department's detective division. As detective sergeant, Welch received a stipend in addition to his sergeant's salary and was eligible for overtime and detail assignments that are not available to sergeants. The Police Chief appoints officers to the detective sergeant position and other so-called "specialist" positions, and the appointees serve in those positions from July 1 through June 30 of the following year. The

decision to appoint or to reappoint individuals to specialist positions is within the sole discretion of the Police Chief. Welch was reappointed to the detective sergeant position each year from 2000 through 2004.

This lawsuit emerged from public controversy surrounding the management of the Stoughton Police Department. In June 2004, the Board of Selectmen decided not to renew Police Chief Manuel Cachopa's contract. This decision reverberated throughout the Town and through the Department and in short order a campaign was initiated to recall the selectmen who had voted not to renew Cachopa's contract and to replace them with defendants Richard Levine and John Kowalczyk. Levine and Kowalczyk promised to reinstate Cachopa as Chief if they were elected.

The recall campaign divided the Department. A number of officers were actively involved in supporting the recall effort, attending meetings and publicly expressing their support for the recall. Defendant Christopher Ciampa, a sergeant at the time, was an outspoken supporter of the campaign, hosting a weekly show on community public television called "Enough is Enough" that focused on the recall campaign and the Board's failure to renew Cachopa's contract. For his part, Welch decided not to participate in any campaign activities related to the recall. His decision to remain neutral was regarded as a betrayal by Cachopa, who allegedly perceived those who did not publicly support the recall as being

against it and, by extension, against him. Cachopa threatened Welch, making comments such as "you picked the wrong side" and "there are going to be changes in July." Welch understood this last comment to mean that he would not be reappointed to the detective sergeant position. Cachopa and some of his supporters would "stare down" officers who did not actively support the recall.

While the recall efforts were underway, two lieutenants in the Department began looking into allegations of police misconduct. The allegations, which included charges of witness intimidation and attempted extortion, implicated Cachopa and several other police officers. A special prosecutor was appointed to handle the investigation and a grand jury was empaneled. In August 2004, acting Police Chief David Chamberlin asked Welch to assist the special prosecutor by participating in the Department's investigation into the alleged misconduct. Welch interviewed witnesses and wrote reports on his findings over the next two months. He also attended the grand jury proceedings, helped the prosecutor prepare witnesses for their grand jury appearances and testified before the grand jury about the results of his investigation.

The investigation exacerbated the divisions within the Department. Officers who supported the recall harassed Welch and other officers who were perceived as not supporting the recall, calling them "weasel" and "rat." In addition, Cachopa told Welch

that he had made a mistake by becoming involved in the investigation. After becoming involved in the investigation, Welch found rubber rats, derogatory cartoons and, on one occasion, a bullet in his mailbox at the police station. In November 2004, Town Manager Mark Stankiewicz placed Cachopa and six other officers on administrative leave after learning that Welch and others who were assisting in the investigation were being harassed. Levine and Kowalczyk were elected to the Board that same month. Shortly thereafter, the Board reinstated Cachopa as Police Chief and directed Stankiewicz to reinstate the other officers who had been placed on leave.

After resuming his position as Chief, Cachopa sought to have Ciampa made deputy chief. Ciampa was a sergeant at the time and in attempting to have Ciampa made deputy chief, Cachopa passed over three higher-ranking lieutenants. Because deputy chief is a civil service position, Stankiewicz told Cachopa that Ciampa could not be made deputy chief without going through the civil service process and he was made an "executive officer" instead. In this capacity, Ciampa was the second in command at the Department. In December 2004, Cachopa changed the shift assignments of three lieutenants who had been involved in the investigation of the Department. He also moved the lieutenants' offices so that they would have to share office space with some of the sergeants who were the subject of the grand jury proceedings. The lieutenants complained to

Stankiewicz about the retaliatory atmosphere at the Department and Stankiewicz hired an independent consultant to look into their complaints. The consultant concluded that retaliation was occurring within the Department and that in changing the lieutenants' shifts and work conditions, Cachopa was motivated by a desire to get back at them for their perceived involvement in the grand jury investigation.

Although he was vindicated by the results of the recall election, Cachopa's tenure as reinstated Chief was relatively brief. In March 2005, the grand jury indicted Cachopa and two other officers. Cachopa was placed on administrative leave and the Board promoted Ciampa from "executive officer" to acting chief. In June 2005, Ciampa made the annual specialist position appointments. Welch and one other officer, Detective Craig Lepro, were not reappointed to their specialist positions. Welch was replaced with an officer who had been a vocal supporter of Cachopa and who was among the officers who had been placed on leave in November 2004 out of concern that he was interfering with the grand jury investigation.

Welch filed this lawsuit in September 2005. He brought a claim under 42 U.S.C. § 1983 alleging that Ciampa, Levine, Kowalczyk and the Town of Stoughton violated his First Amendment rights by removing him from the detective sergeant position in retaliation for his refusal to participate in the recall campaign. In addition,

Welch brought a claim against Ciampa for tortious interference with advantageous business relations. In August 2006, Welch amended his complaint to add Cachopa as a defendant. Welch also added a claim against the individual defendants under the Massachusetts Civil Rights Act and a claim against the Town under the Massachusetts Whistleblower Act. In June 2007, the defendants moved for summary judgment and in September 2007, the district court, in an oral decision from the bench, granted summary judgment for all defendants on all claims. This timely appeal followed.[1]

## II. Discussion

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor. Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008). To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "A genuine issue for trial exists as to [a material] fact if there is evidence from which a reasonable trier could decide the fact either way." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). Although we give the nonmoving party the benefit of all reasonable inferences, a party cannot rest on "conclusory

---

[1]Welch does not appeal the grant of summary judgment on his Massachusetts Civil Rights Act claim.

allegations, improbable inferences, [or] unsupported speculation" to defeat a motion for summary judgment. McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)) (alteration in original).

## A. First Amendment retaliation claim

Welch claims that the defendants retaliated against him for his failure to participate in the recall election by refusing to reappoint him to the specialist position of detective sergeant and by subjecting him to a hostile work environment. In so doing, he alleges, they violated the First Amendment. In Mt. Healthy City School District Board of Education v. Doyle, the Supreme Court established that in order to prevail on a free speech claim, a plaintiff must show that he engaged in constitutionally protected conduct and that this conduct was a substantial or motivating factor in the alleged adverse employment action. 429 U.S. 274, 287 (1977); see also Padilla-García v. Guillermo Rodríguez, 212 F.3d 69, 74 (1st Cir. 2000). This analysis has been applied to political discrimination claims as well. Padilla-García, 212 F.3d at 74. If the plaintiff meets his prima facie burden, the defendant can prevail if it can establish that it would have taken the same action regardless of the plaintiff's political beliefs or protected conduct. Id. We first address whether the alleged retaliation provides a basis for a § 1983 claim and, if it does, against whom

Welch may maintain his claim.

### 1. Non-reappointment to specialist position

The defendants claim that Welch's non-reappointment to the detective sergeant position does not constitute a cognizable adverse employment action. In Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990), the Supreme Court held that adverse actions short of dismissal or demotion, such as denials of promotions, transfers and rehires, can constitute actionable adverse employment decisions. Id. at 75. Although the loss of a specialist appointment is not among the adverse decisions enumerated in Rutan, its consequences are similar to decisions we have found to be actionable under § 1983. See, e.g., Martinez-Vélez v. Rey-Hernández, 506 F.3d 32, 40 (1st Cir. 2007) (plaintiffs lost opportunity for substantial overtime pay and additional duties); Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97, 101 (1st Cir. 1997) (plaintiffs lost supervisory positions and returned to positions of lower rank and salary). Although Welch's base salary remained the same, he lost the additional stipend that accompanied the detective sergeant position as well as the opportunity for substantial overtime pay and additional pay related to detail and court assignments. In addition, as detective sergeant he had been the highest-ranking detective and had been in charge of a department. Viewing the evidence in the light most favorable to Welch, as we must on summary judgment, the loss of those duties is

a significant diminution in his job responsibilities. Thus, Welch's non-reappointment does constitute an adverse employment action sufficient to support a § 1983 claim.

Turning to the question who can be held liable for Welch's non-reappointment, we note that "[i]t is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999). We agree with the district court that Welch has failed to adduce evidence that Cachopa, Levine or Kowalczyk were responsible for the decision not to reappoint Welch. Ciampa alone had the authority to make the specialist position appointments and there is no evidence that Levine and Kowalczyk had any involvement in his decision. Cachopa had been placed on administrative leave several months before the specialist position appointments were made. Perhaps he would have acted on his threat not to reappoint Welch had he been Chief in June 2005, but he was not and his alleged desire to see Welch lose his detective sergeant position is not actionable under § 1983. The district court properly granted summary judgment in favor of Cachopa, Levine and Kowalczyk because Ciampa was the only one with the appointment authority.

2. Harassment

Welch also asserts that he suffered retaliatory harassment that is cognizable under § 1983. "Actions of informal harassment,

as opposed to formal employment actions . . . can be the basis for first amendment claims if the motive was political discrimination; but this is so only if the discriminatory acts are 'sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party.'" Martinez-Vélez, 506 F.3d at 42 (1st Cir. 2007) (quoting Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc)); see also Rosario-Urdaz v. Velazco, 433 F.3d 174, 179 (1st Cir. 2006) ("[S]ubstantial campaign of harassment, instigated or knowingly tolerated by superiors," can form the basis for a § 1983 claim.).

Here, most of the complained-of harassment was perpetrated by officers who are not named as defendants. Cachopa and Ciampa argue that they cannot be held liable for harassment by other officers. We agree. A supervisor who does not participate in the alleged harassment "can be held liable . . . [only] if (1) the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or inaction was 'affirmatively link[ed]' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence [of the supervisor] amounting to deliberate indifference.'" Hegarty v. Somerset County, 53 F.3d 1367, 1379-80 (1st Cir. 1995) (citation omitted) (alterations in original). Welch does not contend that Cachopa or Ciampa were responsible for the

-12-

rubber rats, cartoons or bullet that were left in Welch's mailbox. Nor does he explain how their conduct constituted encouragement or acquiescence in the harassment. He asserts that Ciampa rewarded officers who engaged in harassing behavior by appointing them to specialist positions, but does not explain how Ciampa knew or should have known that these officers were harassing Welch. Thus, Welch cannot hold Cachopa and Ciampa responsible for the harassment he experienced at the hands of other police officers.

Welch does not hang his harassment claims against Cachopa and Ciampa entirely on the supervisory liability peg. He asserts that the pair themselves engaged in retaliatory harassment after the recall election by making Welch complete daily activity sheets and changing the locks to the detective office. But he does not explain how these changes resulted in unreasonably inferior work conditions, and the lack of evidence on this point is fatal to his claim. See Ortiz García v. Toledo Fernández, 405 F.3d 21, 24 (1st Cir. 2005). With respect to Cachopa's alleged harassing comments and "stare downs," the relevant inquiry is whether these actions "resulted in conditions 'unreasonably inferior' to the norm." Rosario-Urdaz, 433 F.3d at 178 (quoting Agosto-de-Feliciano, 889 F.2d at 1218-19).[2] We do not believe they did and affirm the

---

[2]In prior cases we have expressed some doubt as to the continued applicability of Agosto-de-Feliciano after the Supreme Court's decision in Rutan. See, e.g., Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 12 (1st Cir. 2000). However, because Welch relied on Agosto-de-Feliciano before the district court and because

district court's grant of summary judgment for Cachopa on this claim. Having satisfied ourselves that Welch's nonreappointment supports a § 1983 claim against Ciampa, we now assess whether Welch adduced sufficient evidence in support of his claim to survive summary judgment.

### 3. Protected conduct

It is well established that government employees are protected by the First Amendment. See Garcetti v. Ceballos, 547 U.S. 410, 417 (2006); Davignon v. Hodgson, 524 F.3d 91, 100 (1st Cir. 2008). Welch alleges that the defendants violated his rights to free speech and political affiliation. A government employee who alleges that her employer has violated her First Amendment right to free speech must satisfy our three-part test. First, she must establish that she spoke as a citizen on a matter of public concern. Davignon, 524 F.3d at 100. Next she must show that, "when balanced against each other, the First Amendment interests of the plaintiff and the public outweigh the government's interest in functioning efficiently." Jordan v. Carter, 428 F.3d 67, 72 (1st Cir. 2005) (citation omitted). If she satisfies these first two prongs, her final hurdle is to show that her "protected speech was a substantial or motivating factor in the adverse action against [her]." Id. (citation omitted).

---

the district court applied Agosto-de-Feliciano, we assume arguendo that Agosto-de-Feliciano applies. See Ortiz García, 405 F.3d at 23 n.4.

In the present case, Welch contends that the recall election was a matter of public concern, and the defendants do not argue otherwise. Instead, the parties' dispute arises from the fact that Welch chose not to speak out on the election. The defendants contend that because he did not express an opinion on the recall election, he did not engage in any speech protected by the First Amendment. Refusing to speak in the face of an illegitimate request to speak is protected conduct. See Wooley v. Maynard, 430 U.S. 705, 714 (1977); Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 977 (1st Cir. 1993); Sykes v. McDowell, 786 F.2d 1098, 1104 (11th Cir. 1986) ("A public employee who positively asserts the right not to speak when ordered to support his employer is within the protection of the first amendment."). The question is whether Welch was ordered to endorse or support the recall. Welch points out that many officers were actively involved in the recall efforts but he does not allege that any of the defendants ordered him or attempted to coerce him to publicly endorse the recall campaign. Thus, he has not alleged an actionable violation of his right to free speech.

But the First Amendment also prohibits government officials from taking adverse employment action against a non-policymaking government employee based on the employee's political affiliation, see Rutan, 497 U.S. at 73-74; Elrod v. Burns, 427 U.S. 347, 373 (1976), and this theory more accurately captures the nature of Welch's First Amendment claim. In order to establish a prima facie

case of political discrimination, a plaintiff must adduce evidence that

> (1) the plaintiff and the defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's . . . affiliation; (3) . . . a challenged employment action [occurred]; and (4). . . political affiliation was a substantial or motivating factor behind it.

Martinez-Vélez, 506 F.3d at 39 (internal quotation marks omitted) (quoting Pequero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006)) (alteration and omissions in original). The defendants contend that Welch's decision to remain neutral during the recall campaign amounts to the absence of any political affiliation and thus the lack of any protected political activity. They read our precedent too narrowly.

The freedom not to support a candidate or cause is integral to the freedom of association and freedom of political expression that are protected by the First Amendment. See Rutan, 497 U.S. at 76 ("The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate.") (emphasis added); Roberts v. U.S. Jaycees, 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate."); Branti v. Finkel, 445 U.S. 507, 519 (1980) (public employment "cannot properly be conditioned upon . . . allegiance to the political party in

-16-

control"). Punishing an employee for failing to support the prevailing party "unquestionably inhibits protected belief and association." Elrod, 427 U.S. at 359. Thus, the Supreme Court has held that the First Amendment bars a government employer from taking adverse employment action against an employee "solely for not being [a] supporter[ ] of the political party in power, unless party affiliation is an appropriate requirement for the position involved." Rutan, 497 U.S. at 64 (citing Elrod and Branti).

We have applied this rule to protect plaintiffs who are members of a party that is not in power. See, e.g., Acosta-Orozco, 132 F.3d at 101; Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir. 1991). In addition, we have concluded that the risk of retaliation is present where the plaintiff supported one faction of the same political party of which her employer is a member, reasoning that in primary elections, "the risk of retaliation against an employee who supported the opposition is just as high as in any other election." Padilla-García, 212 F.3d at 76. We can discern no principled basis for holding that an employee who supports an opposition group is protected by the First Amendment but one who chooses to remain neutral is vulnerable to retaliation. We recognize that a plaintiff's active support of a candidate or cause may help the plaintiff meet her evidentiary burden of showing that the adverse employment decision was substantially motivated by her political affiliation. See Acevedo-Diaz v. Aponte, 1 F.3d 62, 69

(1st Cir. 1993) (evidence of plaintiffs' "active or prominent roles in [the party's] political activities" supported jury finding of political discrimination). But neither active campaigning for a competing party nor vocal opposition to the defendant's political persuasion are required. In this case, Welch adduced evidence that officers who did not support the recall election were perceived as opposing it. Whether Welch actually affiliated himself with the anti-recall camp is not dispositive since the pro-recall camp attributed to him that affiliation. In sum, we reject the defendants' argument that Welch's claim fails because he chose to remain neutral in the recall election.[3]

## 4. Proof of impermissible retaliatory motive

In order to establish a prima facie case of unconstitutional political discrimination, Welch must establish that there is a genuine issue of material fact as to whether his non-reappointment was substantially motivated by his refusal to support the recall election. "[T]he mere fact that an adverse action was taken after an employee exercises First Amendment rights is not enough by

---

[3]Our conclusion accords with recent decisions of the Third and Tenth Circuits in which those courts determined that political neutrality is protected by the First Amendment. See Gann v. Cline, 519 F.3d 1090, 1093-94 (10th Cir. 2008) (rejecting argument that plaintiff's political patronage claim failed because the plaintiff did not actively campaign against her employer or demonstrate an opposing political affiliation); Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 272 (3d Cir. 2007) ("[T]he right not to have allegiance to the official or party in power itself is protected under the First Amendment, irrespective of whether an employee is actively affiliated with an opposing candidate or party.").

itself to establish a prima facie case." Acosta-Orozco, 132 F.3d at 101. But a plaintiff is not required to produce "smoking gun" evidence of an employer's impermissible motive to defeat a motion for summary judgment. See Davignon, 524 F.3d at 106-07; Acosta-Orozco, 132 F.3d at 101.

A reasonable jury could conclude that Welch would not have been demoted but for his refusal to support the recall election. Although we have observed that "a politically charged atmosphere . . . without more" is insufficient to establish a causal connection between an adverse employment action and a plaintiff's political affiliation (or non-affiliation), LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996) (citation omitted) (alteration in original), we have also noted that a highly-charged political atmosphere, combined with "the fact that plaintiffs and defendants are of competing political persuasions, may be probative of discriminatory animus." Acevedo-Diaz, 1 F.3d at 69 (emphasis in original). "Where the plaintiff is prominent in the opposition to the prevailing faction in a highly-charged political atmosphere, and is known to the defendant to be so, a jury can infer from these facts plus timing that adverse action is politically motivated." Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 23 (1st Cir. 2006). In the present case, we have an undisputedly charged atmosphere in which members of the pro-recall camp regarded those who did not support Cachopa and the recall as being essentially of a competing

political persuasion. In addition, when Cachopa saw Welch during the recall campaign, he would tell Welch that he had "picked the wrong side" and that "there are going to be changes in July." After Cachopa was reinstated as Chief, he selected Ciampa to be his second-in-command over senior officers in the Department. Ciampa had been one of the most outspoken supporters of Cachopa and the recall election. Cachopa and Ciampa were close and shared a common vision for the Department.[3] Prior to the turmoil caused by the recall election, there had been a custom within the Department of reappointing people to specialist positions. Ciampa denied Welch his reappointment at the next available opportunity following the recall election that so divided the Department.[4] Welch was one of two people who held specialist positions and did not support the recall. They were replaced by vocal supporters of the recall. At the time the appointments were made in June 2005, Welch had a spotless employment record and had never been disciplined. Although

---

[3]In its appellate brief, the Town attempts to rebut Welch's theory that Ciampa and Cachopa shared a mutual vision for the Department by citing portions of the record it did not cite before the district court. The Town could have brought these facts to the district court's attention. It did not and we will not consider facts and arguments that were not raised below. Cochran, 328 F.3d at 11.

[4]The Town asserts that Ciampa reappointed one non-supporter of Cachopa as well as a detective who helped Welch in part of his investigation. It also asserts that Ciampa did not appoint two pro-recall officers, arguing that this undermines Welch's theory that Ciampa intended to reward Cachopa supporters. Again, the Town did not make this argument before the district court and we will not consider it. Cochran, 328 F.3d at 11.

Welch has not presented overwhelming evidence that Ciampa acted with a retaliatory motive, he has adduced enough to defeat summary judgment. Catrone v. Thoroughbred Racing Ass'ns of N. Am., Inc., 929 F.2d 881, 889 (1st Cir. 1991) ("[S]ummary judgment is to be used sparingly when intent or motive is at issue . . . .") (citations omitted).

Ciampa is not entitled to summary judgment because the summary judgment record would not compel a finding that Ciampa would have taken the same action regardless of Welch's proposed conduct. Padilla-García, 212 F.3d at 77. We agree with Welch that the district court erred in placing the burden on Welch to show that the reasons articulated by Ciampa were pretextual. The district court seemed to have applied the burden-shifting analysis used in Title VII cases, which, we have explained, is "significantly different" from that used in First Amendment cases. Id. In Title VII cases, "a plaintiff is required to come forward with affirmative evidence that the defendant's nondiscriminatory reason is pretextual." Id. "In a political discrimination case, the defendant bears the burden of persuading the factfinder that its reason is credible." Id. at 77-78. Here, the burden lies with Ciampa.

Ciampa asserts that he refused to reappoint Welch because he wanted to allow other officers to gain experience in specialist positions and that he was concerned that Welch was spending too

much time with a regional drug task force in comparison with his policing duties in Stoughton. But such bare assertions are no substitute for evidence. Further, Ciampa reappointed every specialist except for Welch and one other person who did not support the recall, including several individuals who had held specialist positions for several years, a fact that casts doubt on Ciampa's proffered reason. Because Ciampa has not shown by a preponderance of the evidence that his decision was motivated by non-retaliatory reasons, summary judgment is inappropriate. See Jirau-Bernal v. Agrait, 37 F.3d 1, 4 (1st Cir. 1994) ("Summary judgment would have been warranted . . . only if defendants' evidentiary proffer compelled the finding that political discrimination did not constitute a 'but for' cause for the demotion."). Thus, we reverse the district court's grant of summary judgment for Ciampa on Welch's § 1983 claim.

### 5. Municipal liability

Municipalities cannot be held liable for the constitutional violations of municipal employees pursuant to the doctrine of respondeat superior. Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978). Under § 1983, municipalities can be liable for constitutional violations only if the violation occurs pursuant to an official policy or custom. Id. at 694. A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused by a formal decision of a

-22-

municipal legislative body, see, e.g., Owen v. City of Independence, 445 U.S. 622 (1980), or by a person with final policymaking authority. See City of St. Louis v. Praprotnik, 485 U.S. 112, 123-24 (1988). The district court granted summary judgment for the Town on the grounds that Welch failed to establish the existence of an official policy.

On appeal, Welch argues that the Town had an official policy of "putting into power in the police department individuals who were known to be involved in retaliation and harassment and that this policy led to the treatment that Sergeant Welch suffered." Appellant's Br. at 43. In another context this might be persuasive. However, Welch has failed to provide a sufficient evidentiary basis on which to impose municipal liability. Ciampa is the individual responsible for the nonreappointment and there is no evidence that the Board authorized Ciampa to take retaliatory action against Welch or others who did not support the recall election. But Welch also argues that municipal liability can be imposed because Ciampa is an official with final policymaking authority and this argument is persuasive. The Town asserts that a single incident of misconduct cannot form the basis for municipal liability. Although liability may not be imposed on a municipality for a single instance of misconduct by an official lacking final policymaking authority, see Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985), "it is plain that municipal liability may be imposed for a

-23-

single decision by municipal policymakers under appropriate circumstances." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Id. at 481.

The Town attempts to rely on our decision in Fabiano v. Hopkins, 352 F.3d 447 (1st Cir. 2003), in which we held that the firing of the plaintiff by the "relevant policymaker for the purposes of our § 1983 analysis" did not give rise to municipal liability because the plaintiff did "not point to any relevant City 'policy' beyond the mere fact that [the policymaker] decided to fire him." Id. at 452. The town's reliance on Fabiano is misplaced, however, because in Fabiano we never state that the policymaker had the final policymaking authority.[5] See, e.g., Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002); Roma Constr. Co. v. aRusso, 96 F.3d 566, 576 (1st Cir. 1996); Harrington v. Almy, 977 F.2d 37, 45 (1st Cir. 1992). We are bound by Pembaur and conclude that a single decision by a final policymaker can result in municipal liability. Here, the parties agree that Ciampa, as Chief of Police, is the final policymaking official with respect to the reappointment of

_____

[5]In Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. 1989), we cited Tuttle for the proposition that "evidence of a single event alone cannot establish a municipal custom or policy." Id. at 1156. That case involved a single incident of misconduct on the part of nonpolicymaking police officers, and we did not consider whether a single decision by a policymaker with final authority could give rise to municipal liability under § 1983.

specialists. Accepting the parties' representations as true, liability can be imposed on the Town for Ciampa's decision not to reappoint Welch if that decision violated Welch's constitutional rights. Hence, summary judgment for the Town must be reversed.

B. Whistleblower Claim

The Massachusetts whistleblower statute prohibits public employers from retaliating against employees who participate in any of the act's enumerated protected activities. Protected activities include "[p]rovid[ing] information to, or testif[ying] before any public body conducting an investigation, hearing or inquiry into any violation of law." Mass. Gen. Laws ch. 149 § 185(b)(2). In order to prevail on a claim under the whistleblower statute, a plaintiff must show that he engaged in protected activity and that his participation in that activity played a substantial or motivating part in the retaliatory action. Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 67 (1st Cir. 2001). In granting summary judgment for the Town on Welch's whistleblower claim, the district court concluded that Welch had not shown that Ciampa's decision not to reappoint him was motivated by Welch's involvement in the grand jury proceedings.[6] Viewing the evidence in the light most favorable

---

[6]Welch brought his whistleblower claim against the Town and not Ciampa. "The Whistleblower statute permits only an 'employer' to be sued, not individual supervisors." Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 221 (D. Mass. 2002) (citing Orell v. UMass Mem'l Med. Ctr., Inc., 203 F. Supp. 2d 52, 66-67 (D. Mass. 2002)). "Employer" is defined as "the Commonwealth, and its agencies or political subdivisions, including, but not limited to, cities,

to Welch and drawing all reasonable inferences in his favor, we believe that Welch has adduced enough evidence to survive summary judgment.[7]

The evidence upon which Welch relies suggests a pattern of retaliation against individuals who were involved in the investigation. Cachopa told Welch that he had made a mistake by becoming involved in the investigation. When Cachopa resumed his position as Chief, he changed the shifts of the lieutenants who had assisted in the investigation. The consultant hired by the Town to investigate allegations of retaliation concluded that Cachopa had changed the lieutenants' shifts and reduced their authority as a result of their participation in the grand jury investigation.[8] Ciampa's elevation to the position of deputy chief is consistent with a pattern of retaliation since, in promoting Ciampa, Cachopa passed over higher-ranking lieutenants who participated in the investigation. Although it was Ciampa, not Cachopa, who refused to reappoint Welch, Ciampa owed his position of authority in the

---

towns, counties and regional school districts, or any authority, commission, board or instrumentality thereof." Mass. Gen. Laws. ch. 149, § 185(a)(2).

[7]The Town does not dispute that Welch engaged in protected activity.

[8]The Town asserts that the consultant's report constitutes inadmissible hearsay. The Town did not raise this objection before the district court and thus, has waived it. See O'Rourke v. City of Providence, 235 F.3d 713, 727 (1st Cir. 2001).

Department to Cachopa. Further, in refusing to reappoint Welch to the detective sergeant post, Ciampa replaced Welch with an officer who had harassed Welch and others involved in the investigation. This is consistent with the alleged practice of punishing individuals who were involved in the investigation and rewarding those who opposed the investigation. We conclude that there is circumstantial evidence sufficient to create a genuine issue of material fact as to whether Welch was not reappointed because of his involvement in the grand jury investigation.

C. Tortious interference claim

Welch appeals the district court's grant of summary judgment to Ciampa on his tortious interference claim. In order to prevail on a claim for tortious interference with an advantageous relationship, a plaintiff must prove the following elements:

> (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.

Comey v. Hill, 438 N.E.2d 811, 816 (Mass. 1982) (citation omitted). The district court concluded that because Ciampa was the Town's policymaker with respect to the appointment of specialist positions, there was no third-party interference with Welch's advantageous relations with the Town. It is true that, in general, a plaintiff cannot bring a suit for tortious interference against a party to the underlying contract. Harrison v. Netcentric Corp.,

744 N.E.2d 622, 632 (Mass. 2001). In the employment context, this usually means that "an employee may not sue her employer for interfering with its own contract." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 76 (1st Cir. 2001). But a supervisor can be liable for tortious interference if "'actual malice' . . . was the 'controlling factor' in the [supervisor's] interference." Sklar v. Beth Israel Deaconess Med. Ctr., 797 N.E.2d 381, 385 (Mass. App. Ct. 2003) (citation omitted). "'[A]ctual malice' is a 'spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 88 (1st Cir. 2004) (quoting Shea v. Emmanuel Coll., 682 N.E.2d 1348, 1351 (Mass. 1997)). The district court erred in concluding that Welch could not maintain an action for interference with advantageous relations against Ciampa because Ciampa, representing the Town, was representing the employer, a party to the employment relationship. We reverse the court's grant of summary judgment on this claim.[9] [10]

---

[9]The district court noted that it was an "open question" whether "being a specialist is an advantageous relationship protected by the tort." The court assumed that it was. In reversing the decision of the district court, we express no opinion on this question as the parties do not raise it.

[10]Welch also asks us to remand the case to the district court for the reconsideration of recently discovered evidence in support of the whistleblower claim. We need not address this request because we are already remanding on different grounds.

## III. Conclusion

For the foregoing reasons, we <u>reverse</u> the district court's grant of summary judgment for Ciampa and the Town on Welch's § 1983 claim, whistleblower claim and tortious interference claim and <u>remand</u> for proceedings consistent with this opinion. We <u>affirm</u> the remainder of the district court's grant of summary judgment. Costs are taxed against Christopher Ciampa.