# United States Court of Appeals
## For the First Circuit

No. 17-1174

SCOTT SAUNDERS,

Plaintiff, Appellant,

v.

TOWN OF HULL,

Defendant, Appellee,

RICHARD K. BILLINGS,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

Harold L. Lichten, with whom Peter M. Delano and Lichten & Liss-Riordan, P.C. were on brief, for appellant.
Joseph A. Padolsky, with whom Louison, Costello, Condon & Pfaff, LLP was on brief, for appellee.

October 27, 2018

**LYNCH**, **Circuit Judge**.  This is an appeal from entry of summary judgment in favor of the Town of Hull in a civil rights action brought by a Hull police officer.  Scott Saunders, a decade-long veteran of the Town of Hull Police Department, was passed over for a promotion in November 2014.  He alleges that the Town of Hull and its then Police Chief, Richard Billings, intentionally let his application lapse, and did not promote him, in retaliation for exposing Chief Billings's professional misconduct.  In particular, Saunders -- the President of the local police union at the time -- had reported $130,000 of missing union funds to the Massachusetts Attorney General's Office, and presided over a union-wide vote of no confidence against Chief Billings for his leadership style and policies.

After the Town's Board of Selectmen declined to promote Saunders, pursuant to Chief Billings's recommendation, Saunders brought this suit against both parties.  Saunders alleged that the defendants' unlawful retaliation violated (1) his First Amendment rights under 42 U.S.C. § 1983, and (2) the Massachusetts Whistleblower Act ("MWA"), Mass. Gen. Laws ch. 149, § 185(d).  The district court granted summary judgment for the Town on Saunders's federal and state claims.  We affirm the dismissal of Saunders's § 1983 claim.  With respect to Saunders's MWA claims, we affirm the district court's holding that Saunders's § 185(b)(3) claim is waived.  As to his state claim under § 185(b)(1), we vacate the

entry of summary judgment and direct the district court to dismiss this claim without prejudice.

## I.

### **Background**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Rosenberg v. City of Everett, 328 F.3d 12, 17 (1st Cir. 2003) (citing Fed. R. Civ. P. 56(c) (2016)). We review the district court's entry of summary judgment de novo, construing the record in the light most favorable to Saunders and "indulg[ing] all reasonable inferences" in his favor. Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991).

Using this lens, we credit the following account of events leading up to this suit.

Since 2004, Scott F. Saunders has served on the Town of Hull Police Force, where the defendant, Richard K. Billings, was Chief from 2004-2016. According to Saunders, Billings ran the police department based on favoritism and an "either you're with me or against me" mentality.

For most of his tenure, Saunders felt that he was a member of Billings's "inner circle." Billings had appointed

- 3 -

Saunders to the Honor Guard and sponsored him to serve on the Metro SWAT, a prestigious inter-agency organization of officers from various local towns. However, Saunders and Billings's relationship changed for the worse after Saunders was elected President of the police union, local 344 of the International Brother of Police Officers ("the Union"), where Billings had served as Treasurer from 2000-2003.

A.   Missing Union Funds

As President of the Union, Saunders also headed two organizations affiliated with the police department: Hull Police Associates and Hull Relief Association. These provided death and retirement benefits for Hull police officers.

Shortly after Saunders took over as President in March 2013, he became concerned that the Union's funds had been mismanaged. His suspicions began in April when the treasurer, Greg Shea, was reluctant to authorize a $400 donation to the local little league team. Surprised that the Union could not readily afford the sponsorship, Saunders asked Shea for a financial report. Although Saunders followed up on this request, no report was ever provided.

In fact, when Saunders assumed his role as President, he was never given any documentation of the Union's prior business, including meeting minutes. And when Saunders asked Shea, who had

been serving as the Union's treasurer since 2003, where the money in the Union's account had gone, he was told that the account "never had any money in there," and "that's the way it's always been."

However, in December 2013, Saunders discovered a bag of documents in the locker of a retired officer, John Coggins.[1] The bank statements within the bag led Saunders to believe that the Union had once held over $130,000 in its own, and related, bank accounts. Saunders immediately reported this discovery to Shea, who denied the existence of the additional accounts. That same day, Saunders called the Massachusetts Attorney General's Office ("AG") to report the documents that he had found.

Around January 2014, the AG responded that Saunders did not have enough evidence of a crime for the AG to launch an investigation, and asked him to obtain more records to substantiate his allegations of embezzlement. Saunders subsequently discovered bank statements and other documents showing, inter alia, that (1) Billings had co-signed two checks -- totaling $1,400 -- from an affiliated account in 2010, and that (2) during Billings's tenure

---

[1] When Saunders became Union President, he decided to clean out the locker room in the police station. He gave officers one week to claim their lockers. After the deadline, abandoned lockers would have their locks cut and contents emptied. However, before Saunders could implement the plan, an unidentified individual cut the locks and left several lockers open. The documents in Coggins's locker were discovered shortly thereafter.

as Treasurer, four officers had charged $5,312.55 to an American Express account in the Union's name.

Before he presented this evidence to the AG, Saunders spoke with the Town Manager and had a sit-down meeting with Billings and two other officers to review the bank statements. At the meeting, Billings kept the focus on Shea's alleged embezzlement. Shea was placed on administrative leave that same day and later left the police force in April 2014.

In light of this new evidence, the AG began to investigate the missing funds in March 2014. A retired Hull police officer also filed a civil lawsuit against Billings and three other officers for misuse and misappropriation of Union funds. At the time this appeal was briefed, the lawsuit was pending, and the criminal investigation had resulted in one indictment -- that of Greg Shea -- on March 13, 2015. The whole affair received widespread coverage in local newspapers.

B.   Vote of No Confidence

Around the time that Saunders discovered the bank statements in Coggins's locker, relations between Billings and the Union members began to deteriorate. Billings demanded to find out who had cut the locks in the police locker room, and threatened to make every officer take a polygraph test if no one came forward.

Saunders also received numerous complaints about Billings, including allegations of nepotism, retaliation, and intimidation.

On June 21, 2014, Saunders led a Union-wide vote of no confidence against Billings. The only prefatory statements before the vote were, as reflected in Saunders's meeting notes:

> For two weeks I have been attempting to arrange for the labor meeting with administration, Town Manager, and IBPO [International Brotherhood of Police Officers]. On Tuesday the Executive Board met with the FOP [Fraternal Order of Police] and discussed the confidence vote the same day Town Manager set up a meeting with IBPO for June 30th. Make a motion to vote on the confidence of the Chief.

And the ballots for the vote very simply stated: "I have confidence in the Chief," with an option for "yes" and one for "no."

The Union passed the vote of no confidence, and the meeting adjourned. The next day, Saunders received an email asking him to call the Town Manager, who requested the reasons for the vote. Later that week, Saunders sent a twenty-three page list of reasons to the Union representative, who then forwarded it to the Town Manager.

As summarized in the complaint, the list of reasons included:

> [1] Chief Billings's misuse and misappropriation of police department funds for personal use; [2] Billings's approval of excessive, expensive, and unnecessary overtime for a high-ranking officer . . . ;

- 7 -

> [3] Billings's failure to provide adequate training and equipment to full-time and permanent intermittent officers . . . ; [4] Billings's requirement that officers write more revenue-generating tickets; and [5] Billings's threat to punish officers who issue warnings instead of revenue-generating tickets.

Both the vote and the list of reasons received coverage from The Hull Times.

## C. Decision Not to Promote Saunders

In April 2014, before the late-June vote of no confidence, and in the midst of the AG's embezzlement investigation, a sergeant position opened up due to Shea's resignation. At the time, only Saunders and one other officer, Craig Lepro, had obtained the requisite score on the civil service exam to be placed on the promotional list.

The Town of Hull's Board of Selectmen ("the Board") was the ultimate appointing authority in such matters. However, the Hull Police Department Policy and Procedure Manual made it "the responsibility of the Police Chief to coordinate the entire process and make a recommendation . . . ." As part of this process, each candidate was vetted by an interview panel selected by the Chief. The panel submitted its findings to the Chief, who then sent his final recommendation to the Board.

In order to evaluate Saunders and Lepro, Billings recommended that each be given a trial period of 45 days as Acting

- 8 -

Sergeant.  Lepro served first, and then Saunders began his trial period on June 16, 2014.

Shortly thereafter, the Union passed its vote of no confidence in Billings.  In response, Billings called Saunders into his office for a closed-door meeting.  During their hour-long conversation, Billings allegedly yelled at Saunders and remarked, "I'm the Chief and I don't answer to you."  At the end of the meeting, Billings allegedly threatened to let the promotion list expire so that Saunders would have to retake the exam, and stated that he would personally make sure that Saunders was never promoted.

After Lepro and Saunders's trial periods concluded, the interview panel ranked Lepro first, but concluded that both officers would make "good candidates for sergeant" and that "[the panel members] would promote both if it was their decision." Although a second sergeant position had opened up in the interim, Billings only recommended Lepro for the promotion.  With regards to Saunders, the relevant portion of Billings's letter to the Board stated:

> I concur with [the panel's] assessment and my own observations of both candidates convince me that Officer Saunders would also make a fine addition to the Sergeant complement of the Hull Police Department.
>
> As the Board is aware the recent lateral transfer of Sergeant Bart Forzese to Milton PD creates a currently funded position for

- 9 -

> sergeant . . . . <u>Therefore regarding the open position I would like to know what the Board would like to do</u> regarding same at this time.
>
> <u>I am available to discuss this recommendation and appointment and second open position</u> with the Board at their convenience and have available to you all the of the pertinent background information and interview results.

On November 18, 2014, the Town Board of Selectman voted to adopt Billings's recommendation to promote Lepro, but did not promote Saunders to the second vacant position. When Billings called Saunders into his office to discuss the decision, he attributed it to Saunders's actions to date, stating, "[Y]ou can't fight Town Hall," and "Town Hall has my back."

One month later, Saunders filed an appeal with the Civil Service Commission. He continued to serve as sergeant in a provisional capacity because the second sergeant position remained vacant. However, Saunders became ineligible for a permanent promotion after he failed his subsequent civil service exam. Saunders then petitioned the Commission to "investigate whether the Town's decision to let him 'die on the vine' [was] based on political or personal bias." On May 4, 2015, the Commission rejected both his appeal and his request for an investigation.

D.   U.S. District Court Proceedings

Saunders filed this lawsuit on April 3, 2015, seeking (1) an injunction compelling the Town of Hull to promote him to

sergeant, and (2) money damages.  He alleged that both Billings and the Town of Hull violated his First Amendment rights under § 1983 (Count I) and the MWA (Count II), and that Billings, in his individual capacity, tortiously interfered with his advantageous business relations (Count III).

Both defendants moved for summary judgment.  The district court denied the motion with respect Saunders's First Amendment and tortious interference claims against Billings.  However, it entered judgment for the defendants on Saunders's § 1983 and MWA claims against the Town.  The parties later filed a joint motion to dismiss the claims against Billings pursuant to a settlement agreement.  This had no effect on the remaining claims against the Town of Hull.

The district court dismissed Saunders's § 1983 claim against the Town on the ground that he failed to establish that the alleged retaliation was "a policy or custom of the Town of Hull."  It also held that he could not avail himself of the MWA's protections because he had failed to provide written notice of his suit, as required by the statute's notice provision.

Saunders filed a motion for reconsideration of his MWA claims, arguing (for the first time) that he did provide adequate notice.  In the alternative, he, for the first time, asked the court to certify the interpretation of the MWA notice requirement

- 11 -

to the Massachusetts Supreme Judicial Court ("SJC"). In a separate motion, Saunders also sought reconsideration of his First Amendment claim. Both of his motions were denied in January 2016. Saunders now appeals to challenge the district court's judgment in favor of the Town on both the federal and the state count.

## II.

### **Section 1983 Claim**

Saunders concedes that Town of Hull's Board of Selectmen -- not Billings -- was the relevant and final policymaker for the adverse promotion decision in his case. He argues that the district court nevertheless erred in granting summary judgment against his § 1983 claim because a reasonable jury could have found the Board liable on the grounds that it was <u>aware</u> of Billings's retaliatory motive and <u>ratified</u> his decision.[2] Even construing the record in Saunders's favor, we see no basis for this claim.

The Supreme Court held in <u>City of St. Louis</u> v. <u>Praprotnik</u>, 485 U.S. 112 (1988), that ratification is "chargeable to the municipality" only if "the authorized policymakers approve a subordinate's decision and <u>the basis for it</u>." <u>Id.</u> at 126

---

[2] Saunders does not advance any other grounds for municipal liability. Rather, his briefing makes clear that the sole basis of his appeal is the decision of the Town of Hull's Board of Selectmen not to promote him.

(plurality opinion) (emphasis added); see also Walden v. City of Providence, 596 F.3d 38, 57 (1st Cir. 2010) (applying Praprotnik).

Although Praprotnik does not define what constitutes "ratification," it draws a line between passive and active approval. The Court noted that "[s]imply going along with discretionary decisions made by one's subordinates," and the "mere failure to investigate . . . especially where . . . the wrongfulness of the subordinate's decision arises from a retaliatory motive," is insufficient to trigger § 1983 liability. Praprotnik, 485 U.S. at 130. In contrast, the Court cautioned that:

> It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker. It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware.

Id. (emphasis added).

Our Court has yet to address the precise contours of this ratification doctrine. In a factually similar case, Welch v. Ciampa, 542 F.3d 927 (1st Cir. 2008), we never reached the issue because the parties stipulated that the Acting Police Chief, not the Board of Selectmen, was the "final policymaking official" in that case. Id. at 942. Nevertheless, our dicta in Welch is still illustrative.

There, Officer Welch alleged that he was denied reappointment to his specialist position in the police force because he had refused to participate in a campaign to reinstate the former Police Chief. Id. at 933-35. Instead, Welch had assisted with an investigation into the former Chief's misconduct. Id. at 934. The former Chief warned Welch that he had "picked the wrong side," and that "there [were] going to be changes." Id. Welch later "found rubber rats, derogatory cartoons and, on one occasion, a bullet in his mailbox at the police station." Id. After the former Chief was vindicated by a recall campaign against the Town Selectmen who had refused to extend his tenure, the Acting Chief refused to reappoint Welch to his specialist position. Id. at 935.

Although we held that this circumstantial evidence was enough to permit an inference of the Acting Police Chief's retaliatory motive against Welch, we nevertheless found that Welch "failed to provide a sufficient evidentiary basis on which to impose municipal liability" based on the Board's actions because "[the Acting Chief] is the individual responsible for the nonreappointment and there is no evidence that the Board authorized [him] to take retaliatory action against Welch or others . . . ." Id. at 942.

Saunders offers even weaker circumstantial evidence to establish that the Board here adopted Billings's retaliatory

motive.  First, Saunders alleges that the Board knew that he had implicated Billings in the embezzlement scandal and had led a vote of no confidence against him.  Second, Saunders notes that, after the Board had declined to promote him to the vacant sergeant position, Billings explained that the decision was because of his role in those events, and remarked, "[Y]ou can't fight Town Hall," and "Town Hall has my back."  Based solely on these allegations, Saunders contends that a reasonable jury could have found that the Town's Board of Selectmen ratified the retaliatory basis for Billings's decision.

"Although we give the nonmoving party the benefit of all reasonable inferences, a party cannot rest on 'conclusory allegations, improbable inferences, [or] unsupported speculation' to defeat a motion for summary judgment."  Welch, 542 F.3d at 935 (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).  Saunders's assertion that the Board knew of, and ratified, Billings's retaliatory motive is just that: a conclusory allegation.

In Welch, even evidence of an "undisputedly charged atmosphere" and retaliation within the police department was insufficient to impute a retaliatory motive to the Board.  542 F.3d at 940.  Instead, we noted that some evidence is needed to establish the Board's knowledge and authorization of the alleged retaliation.  Id.

Saunders can point to no evidence linking the Board to Billings's purported retaliatory motive, aside from Billings's single statement: "Town Hall has my back."  Saunders did not depose any Board members to obtain information to substantiate his claim. Nor does he proffer any communications suggesting that the Board members were aware of -- let alone expressly approved of -- Billings's motive.[3]  There is nothing in the record, aside from Saunders's own suspicions to suggest that the Board did not simply "go[] along" with Billings's decision or "mere[ly] fail[] to investigate" why he did not affirmatively recommend that the Board promote Saunders to the vacant sergeant position.  Praprotnik, 485 U.S. at 130.

As such, the district court correctly held that Saunders failed to raise a genuine dispute as to whether the Board members "ratified" Billings's alleged retaliation under Praprotnik.

III.

**Massachusetts Whistleblower Act (MWA) Claims**

Saunders also appeals from entry of judgment against his state law claims.  He argues that the district court erred in holding that his lawsuit was barred by the MWA's notice

---

[3]    In fact, the letter from Billings to the Board regarding Saunders's promotion was laudatory.  Billings wrote that "Officer Saunders would also make a fine addition to the Sergeant complement."

requirement, see Mass. Gen. Laws ch. 149, § 185(c)(1), because his underlying whistleblowing activity was exempt from the notice requirement.  Specifically, Saunders alleges that (1) his disclosure to the AG fell under the § 185(c)(2)(C) exception for reporting a crime, and (2) his role in leading the vote of no confidence was exempt under § 185(b)(3).

As a threshold matter, we hold that Saunders waived his § 185(b)(3) claim.  "It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal."  McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991).  Saunders did not specifically plead the § 185(b)(3) claim in his complaint, nor did he provide any support for why the vote of no confidence constituted a (b)(3) claim in his opposition to summary judgment.  Instead, Saunders rotely recited that he "also has a valid claim under the Whistleblower Statute for objecting to what he reasonably believed were policies and practices by Defendant Billings . . . under M.G.L. c. 149, § 185(b)(3) . . . ."  This is precisely the kind of perfunctory argument that we "ordinarily refuse to deem . . . preserved for appellate review."  Id.

We turn to whether, after dismissal of the only federal claim in this case, Saunders's lawsuit -- based on § 185(b)(1) of the MWA -- should have been heard by the district court.

Saunders's claim is that the Town, through its Board of Selectmen, retaliated against him because he reported the alleged mishandling of Union funds to the AG. The underlying issue is whether, before filing this lawsuit, Saunders had to give written notice to a supervisor and afford the employer a reasonable opportunity to correct the activity of which he complained.

The notice provision, § 185(c)(1), states:

> Except as provided in paragraph [(c)(2)], the protection against retaliatory action provided by subsection (b)(1) shall not apply to an employee who makes a disclosure to a public body <u>unless the employee has brought the activity . . . to the attention of a supervisor</u> of the employee <u>by written notice</u> and has afforded the employer opportunity to correct the activity, policy or practice."

Mass. Gen. Laws ch. 149, § 185(c)(1)(emphasis added). The carveout relevant to this case, § 185(c)(2)(C), exempts an employee who "makes the disclosure to a public body . . . for the purpose of providing evidence of what the employee reasonably believes to be a crime." Id. § 185(c)(2)(C).

In Dirrane v. Brookline Police Dep't, 315 F.3d 65 (1st Cir. 2002), this Court, in the absence of guidance from the SJC on the issue, held that the state-law notice provision is a "hard and fast rule" that precludes the filing of lawsuits for wrongful retaliation without prior notice because the MWA "defines 'public bodies' to include 'any federal, state, or local judiciary,'" and

- 18 -

a lawsuit is a form of disclosure. Id. at 73 (quoting Mass. Gen. Laws ch. 149, § 185(a)(3)). Since then, the highest Massachusetts state court to have interpreted the provision -- the Appeals Court -- held in Quazi v. Barnstable Cty., 877 N.E.2d 273 (Mass. App. Ct. 2007), that written notice of a lawsuit is only required if the victim's whistleblowing activity falls under § 185(b)(1) (disclosing or threatening to disclose the employer's misconduct), but not if the victim's conduct is embraced by § 185(b)(3) (objecting to or refusing to participate in such misconduct). See id. at 275-76.

Although the Massachusetts Appeals Court distinguished Dirrane on the ground that its holding was cabined to § 185(b)(1) claims, see Quazi, 877 N.E.2d at 276, the court's reasoning directly conflicted with a key assumption of Dirrane, and its progeny, Wagner v. City of Holyoke, 404 F.3d 504 (1st Cir. 2005). Compare Quazi, 877 N.E.2d at 276 n.3 (finding that a lawsuit for retaliation is not, in and of itself, a "claim through § 185(b)(1), thus making [the notice provision] applicable"), with Wagner, 404 F.3d at 509 (finding that in order for the § 185(c)(2)(C) exception to apply to plaintiff's suit, he must demonstrate that "the disclosure at issue here -- his filing of suit -- was for the purpose of providing criminal intelligence" (emphasis added)). The SJC has yet to rule on whether a lawsuit for wrongful

retaliation is itself a disclosure to a public body under § 185(b)(1).[4]

Because Saunders's MWA claim turns on a hotly disputed interpretation of state law, we need not, and indeed, should not, resolve it here. We have held that "it can be an abuse of discretion -- if no federal claim remains -- for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by state courts." Wilber v. Curtis, 872 F.3d 15, 22 (1st Cir. 2017) (citing Desjardins v. Willard, 777 F.3d 43, 45-46 (1st Cir. 2015)). When confronted with such state law issues on appeal, we can order the district court to dismiss the state claims on remand without reaching "whether the district court abused its discretion in resolving the state law claims when it did." Desjardins, 777 F.3d at 46. That is what this Court did in Desjardins, see id., and Wilber, see 872 F.3d at 17-18, 22.

We reach the same result here. Saunders's MWA claim is only before us due to supplemental jurisdiction. See 28 U.S.C.

---

[4] Even though Dirrane, as later interpreted and applied in Wagner, and Quazi are admittedly in tension, we reject Saunders's request for certification. Saunders initially filed this case in the U.S. District Court for the District of Massachusetts, not in Massachusetts state court, where he could have brought all of his claims. He knew that Dirrane and Wagner applied when he filed. In any case, our disposition of this appeal will leave its ultimate resolution to the Commonwealth courts.

§ 1367. But given our decision to affirm the entry of summary judgment as to Saunders's § 1983 claim, there is no longer a federal claim in this case. Accordingly, "the balance of factors to be considered under pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity" all "point toward declining to exercise jurisdiction over the state law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 342, 350 n.7 (1988). This makes especial sense where, as here, there is a reasonable argument that our precedent is not in accord with the manner in which the SJC may well read Massachusetts law, and the plaintiff himself is asking that we get the issue answered by the Commonwealth courts. Accordingly, we leave the interpretation of Massachusetts law to Massachusetts courts.[5]

IV.

## Conclusion

We affirm the district court's entry of summary judgment for the Town of Hull on Saunders's § 1983 claim. With respect to

---

[5] We dismiss Saunders's claim based on § 185(b)(1) of the MWA without prejudice, noting the tolling provision in 28 U.S.C. § 1367(d). See Brown v. City of Bos., No. 96-1074, 1996 WL 590553, at *1 (1st Cir. Oct. 15, 1996)(citing Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1267 (D.C. Cir. 1995) (when a state claim over which a federal court has exercised supplemental jurisdiction is dismissed, § 1367(d) tolls the state statute of limitations until 30 days after the dismissal)).

Saunders's MWA claims, we affirm the dismissal of the § 185(b)(3) claim.  As to the § 185(b)(1) claim, we vacate the district court's entry of summary judgment and remand with instructions to dismiss that claim without prejudice.  Each party shall bear their own costs.