RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0409p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JEFF DYE, TAMMIE ERSKINE, PATRICK HALL,
and ERIC PERTTUNEN,

                    *Plaintiffs-Appellants*,

                                   No. 11-1828

      *v.*

OFFICE OF THE RACING COMMISSION;
CHRISTINE WHITE, individually and in her
official capacity as Racing Commissioner;
and GARY POST, individually and in his
official capacity as Deputy Commissioner,

                    *Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-13048—Nancy G. Edmunds, District Judge.

Argued: October 4, 2012

Decided and Filed:  December 18, 2012

Before:  MERRITT, MOORE, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Lisa C. Ward, Okemos, Michigan, for Appellants.  Jeanmarie Miller, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.  **ON BRIEF:** Lisa C. Ward, Okemos, Michigan, for Appellants.  Jeanmarie Miller, Margaret A. Nelson, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

MOORE, J., delivered the opinion of the court, in which MERRITT, J., joined., and McKEAGUE, J., joined in part.  McKEAGUE, J. (pp. 31–46), delivered a separate opinion concurring in part and dissenting in part.

1

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Four racing stewards employed by the State of Michigan argue that their Democratic supervisors retaliated against them for voicing support for or being perceived as affiliated with the Republican candidate in the 2006 Michigan gubernatorial election.  Although certain stewards openly endorsed this candidate in the workplace, others remained silent.  Nonetheless, all allege that they were retaliated against on the basis of political speech and affiliation.  These facts thus present us with an issue of first impression for our court:  whether individuals claiming to have been retaliated against because of their political affiliation must show that they were actually affiliated with the political party or candidate at issue.  We believe that they do not.

Plaintiffs-Appellants Jeff Dye, Tammie Erskine, Patrick Hall, and Eric Perttunen (collectively, "the stewards") appeal the district court's grant of summary judgment in favor of Defendants-Appellees former Racing Commissioner Christine White and former Deputy Racing Commissioner Gary Post (collectively, "the defendants").  For the reasons stated below, we reverse the district court with respect to Dye's protected-speech and political-affiliation retaliation claims and part of the stewards' political-affiliation retaliation claims.  We affirm the remainder of the district court's grant of summary judgment.

## I.  BACKGROUND

The Office of the Racing Commissioner ("ORC") is a state government agency that regulates the Michigan horse-racing industry.  The ORC hires racing stewards as independent contractors to perform regulatory, judging, and enforcement functions in

conjunction with the three types of horse races that occur in Michigan: Harness, Thoroughbred, and Quarter Horse.

The plaintiffs in this case were appointed as racing stewards in the 1980s and 1990s. Patrick Hall was appointed on March 17, 1980, and currently works as a state steward for the Michigan Gaming Board. Jeff Dye was appointed on April 22, 1988, and was promoted to Administrative Liaison Steward in 1998. Dye was demoted to State Steward on December 31, 2006, and was terminated in June 2009. Eric Perttunen was appointed on March 22, 1994, and remains employed as a racing steward for the Michigan Gaming Board. Tammie Erskine was appointed on September 20, 1999, and was terminated on June 6, 2009.

The claims brought by the stewards require an understanding of the political context in Michigan and within the ORC during the 2005-2007 period. In 2005, when the alleged speech began, Democrat Jennifer Granholm was the Governor of Michigan. In January 2005, Granholm appointed White to serve as Racing Commissioner, and White was confirmed in October 2005 after a confirmation hearing before the state Senate. In the fall of 2006, Granholm was successful in her bid for reelection against Republican candidate Dick DeVos. White remained Racing Commissioner until July 2009.

Prior to being confirmed, White served as interim Racing Commissioner and was present in the agency on a daily basis leading up to the confirmation hearings. In July 2006, White hired Gary Post as a contract management consultant. When his assignment was complete in September 2006, White appointed him to the Deputy Racing Commissioner position, which he began on October 11, 2006.

After White's confirmation and Post's appointment, the defendants began making administrative changes to the stewards' job duties, timekeeping procedures, number of days worked, and travel reimbursements. In October or November of 2006, Post told

Dye that White planned to eliminate the Administrative Liaison Steward position at the expiration of Dye's contract on December 31, 2006. Dye continued working as a racing steward until both he and Erskine were terminated in June 2009. The stewards argue that these actions were taken in retaliation for their being perceived as affiliated with the Republican Party and having engaged in protected speech during the 2006 gubernatorial election and confirmation process.

The plaintiffs filed a civil action in the U.S. District Court for the Eastern District of Michigan alleging a § 1983 First Amendment retaliation claim against the ORC; White, individually and in her official capacity as Racing Commissioner; and Post, individually and in his official capacity as Deputy Commissioner. The parties stipulated to dismiss with prejudice the claims against the ORC and White in her official capacity, and the district court granted in part and denied in part a dismissal motion with respect to the declaratory and injunctive relief claims against Post in his official capacity.

The remaining defendants brought a motion for summary judgment before the district court, arguing that the stewards could not provide evidence to sustain their burden. The district court granted the motion and entered judgment for the defendants. Additionally, in the order granting summary judgment, the district court dismissed all claims against Post in his official capacity as moot given that Post is no longer employed in any state capacity. *Dye v. Office of Racing Comm'n*, No. 09-13048, 2011 WL 2144485, at *1 (E.D. Mich. May 31, 2011).

## II.  PROTECTED FIRST AMENDMENT ACTIVITY

At issue in this appeal are claims of retaliation based on protected speech ("protected-speech retaliation") and retaliation based on political affiliation ("political-

affiliation retaliation").[1] Protected-speech retaliation and political-affiliation retaliation are both governed by the First Amendment retaliation doctrine.[2]

## A.  Standard for First Amendment Retaliation Claims

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).  We review the evidence and draw all inferences in the light most favorable to the stewards as the nonmoving parties.  *Id.*

First Amendment retaliation claims are analyzed under a burden-shifting framework.  A plaintiff must first make a prima facie case of retaliation, which comprises the following elements:  "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct."  *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006).  If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (internal quotation

---

[1]The stewards also cite political-patronage dismissal cases in their brief.  Although this raises some ambiguity as to the nature of the claim, the record suggests that they are asserting a political-affiliation retaliation claim rather than a political-patronage dismissal claim.  The operative complaint alleges that "Defendants' actions in limiting and terminating Plaintiffs' employment because of their constitutionally protected speech and political association abridged their rights to freedom of speech and political association in violation of the First and Fourteenth Amendments to the U.S. Constitution."  R. 14 (Second Am. Compl. at ¶ 61) (Page ID #76).  The complaint also specifically alleges retaliation for political views: "In retaliation for their differing political views . . . ." *Id.* at ¶ 40 (Page ID #73).

Further, the legal framework for a political-patronage dismissal claim is entirely distinct from a First Amendment retaliation claim.  Under the political-patronage doctrine, we must first "ask[] whether the party asserting that he was wrongfully terminated has produced sufficient evidence for a jury to find that he was discharged because of his political beliefs or affiliations." *Lane v. City of LaFollette, Tenn.*, 490 F.3d 410, 419 (6th Cir. 2007).  If this burden is met, "then the burden shifts to the employer to demonstrate that the terminated party's job was one for which political affiliation was an appropriate requirement." *Id.*

[2]The Supreme Court has clearly established that First Amendment protections extend to independent contractors hired by the state.  *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714–15 (1996).

marks omitted). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims.

**B. Protected-Speech Retaliation Claim**

The stewards appeal the district court's determination that Erskine, Hall, and Perttunen did not engage in protected speech. The district court concluded that Dye engaged in protected speech when he vocalized his support for gubernatorial candidate DeVos to Post and other employees in the office. *Dye*, 2011 WL 2144485, at *8. These discussions were accurately depicted as protected speech by the district court,[3] and Dye's claim therefore prevails at this stage. We will now turn to the alleged protected speech of Erskine, Hall, and Perttunen.

In a protected-speech case, the court must first discern whether the speech is protected. In order to establish this element, the stewards must show that the speech touches on a matter of public concern. *Scarbrough*, 470 F.3d at 255. The Supreme Court has defined "public concern" as speech "relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).

When speech does relate to a matter of public concern, the court must then apply the *Pickering* balancing test "to determine if the employee's free speech interests outweigh the efficiency interests of the government as an employer." *Scarbrough*, 470 F.3d at 255 (internal quotation marks omitted) (relying on *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). Considerations involved in this balancing test include "whether the statement impairs discipline by superiors or harmony among co-workers, has a

---

[3]Neither side disputes this conclusion or provides any evidence controverting the underlying facts. Appellees Br. at 36, 43, 51.

detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

### 1. Erskine

The stewards argue that Erskine engaged in protected speech when she declined to testify at White's confirmation hearing for fear of being fired, spoke to state senators about White, and critiqued White's performance as Racing Commissioner to her coworkers. Appellants Br. at 19, 37. Erskine testified in her deposition that she had discussions with the offices of two state senators. The first discussion occurred when State Senator Gotchka contacted Erskine to discuss a complaint his office had received regarding a discrepancy between the times clocked by two different race clockers at a horse race. Even when reading her deposition testimony in the light most favorable to the stewards, this alleged discussion appears to be nothing more than Erskine fielding a complaint from a public official regarding the ORC's policy of clocking horse races. It simply makes no sense to construe this interaction as protected speech related to White's confirmation hearing or the gubernatorial election, the only two bases on which the stewards seek relief.

State Senator Gotchka's office subsequently asked Erskine if she would like to testify against White at her confirmation hearing. Erskine testified that she declined to speak at White's confirmation hearing because "[White] was trying to find out consistently who was involved in her confirmation hearing and had made statements to other people that worked in the office." R. 50-1 (Erskine Tr. at 72:11–14) (Page ID #871). Erskine continued that "I chose not to for the fear of being fired. We were asked to; and had we testified, the statement was, she probably wouldn't have been confirmed." *Id.* at 73:10–12 (Page ID #872). Such an allegation, though, does not fit into the protected-speech retaliation doctrine. If anything, Erskine is describing

preemptive behavior on the part of White rather than retaliatory actions. This is confirmed by Erskine's repeated denials, or statements that she cannot remember, that she gave any information to the state senator's office concerning White during any of these conversations.

Additionally, after the confirmation, Erskine contacted State Senator Birkholz's office to gather more information on an accusation made by Erskine's friend that White had improperly spoken to state senators prior to her confirmation hearing. Specifically, Erskine inquired as to whether any policy proscribed such behavior. Erskine testified that she did not tell Senator Birkholz whether she supported White. As with the discussion regarding the race clockers, this interaction with a state senator's office cannot support a claim of retaliation. A phone conversation with an aide in a state senator's office in which the sole question asked was whether a policy existed is vastly different from filing a complaint, either written or oral, with a state senator concerning opposition to a public official's confirmation. Erskine attempts to categorize this phone call as the latter, but the facts do not support reaching such a conclusion.

Erskine also testified that after working with White "on a day-to-day basis in a working relationship," she stopped supporting White and began discussing her complaints with other employees, her family, and her peers. *Id.* at 57:1–58:5 (Page ID #864). These comments, however, reflect matters of personal concern. *See Thomson v. Scheid*, 977 F.2d 1017, 1020–21 (6th Cir. 1992) ("Not all matters discussed within a government office are of public concern, and thus internal office communication does not necessarily give rise to a constitutional claim."). Although White is a public official, the complaints mentioned by Erskine in the record are those of a personal nature that come from working with White on a daily basis rather than those that touch on political, policy, or social matters affecting the public. *See Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004) ("[V]iewed in the context of the complete record, we believe that the primary focus, point, or communicative purpose of Appellant's letters was his own

personal beef with the union and the school district concerning his deteriorating job situation, and his references to collusion or corruption were passing references that were incidental to the message conveyed. Thus his letters were not matters of public concern.") (internal quotation marks and footnotes omitted). Erskine testified that "it would be a personal nature; but professionally, we had to support her;" "Well, it would be, example of not liking someone but you have to work with them, you know; so you're professional and you do what you're supposed to do and your duties;" and she discussed with her peers that "I didn't—I couldn't believe or anybody else could believe she was confirmed." R. 50-1 (Erskine Tr. at 59:1–25) (Page ID #865). Erskine also mentioned that she was critical of certain policies that White enacted, but she could not offer any specific examples: "There were many occasions [Post and White] would do something, and it was, like, they would call me, ask me my opinion. I would tell them. I was critical of what was taking place." *Id.* at 60:5–12. In sum, although Erskine spoke with many people about her disapproval of White both personally and professionally, the district court was correct in concluding that none of this testimony supports a finding that Erskine engaged in protected speech.

### 2. Hall

The stewards argue that Hall engaged in protected speech when he asserted his support for DeVos to licensees at races that he was working. Appellants Br. at 39. The stewards cite excerpts of White's deposition testimony to support this argument. *Id.* White testified at her deposition that she had received complaints about Hall from licensees that the ORC regulates and that she discussed these complaints at a meeting with the stewards. White explained that the complaints detailed an instance in which "Hall had been campaigning on—while he was duty [sic] with licensees that we regulated." R. 49-3 (White Tr. at 83:17–25) (Page ID #578).[4]

---

[4]Additionally, the district court analyzed statements made by Hall in his deposition that he expressed opposition to White's confirmation to the other stewards. *Dye*, 2011 WL 2144485, at *10. As the stewards do not make any arguments concerning these statements and do not cite this deposition

Although Hall's speech touched on a matter of public concern—the gubernatorial election—it was not protected speech under the *Pickering* balancing test. As the district court observed, Hall's speech "involved his urging licensees regulated by the ORC to vote for DeVos and thus had the potential to interfere with the ORC's efficacy and efficiency." *Dye*, 2011 WL 2144485, at *8. The law is clear that speech disruptive to the effective operation of a government agency outweighs its First Amendment protections. *Waters v. Churchill*, 511 U.S. 661, 681 (1994) (plurality opinion) ("As a matter of law, this potential disruptiveness was enough to outweigh whatever First Amendment value the speech might have had."); *Farhat v. Jopke*, 370 F.3d 580, 594 (6th Cir. 2004) ("Appellants 'speech' was highly disruptive to the point that it interfered with the effective operation of the school district's custodial staff."). Hall's speech was plainly disruptive to the agency's effective operation of its horse races. Hall was campaigning for a gubernatorial candidate on-site during work hours to individuals regulated by the agency. Therefore, the district court was correct in determining that this was not protected speech.

### 3. Perttunen

The stewards do not provide any evidence that Perttunen engaged in protected speech. The only evidence provided specific to Perttunen is deposition testimony in which he states that "[t]here *may* have been discussions amongst stewards only about who may be a better candidate for our industry to survive." R. 47-6 (Perttunen Tr. at 54:2–4) (Page ID #368) (emphasis added). This evidence does not reflect that Perttunen ever took part in these discussions or that these discussions even occurred. The district court was therefore correct in determining that Perttunen did not provide evidence that he engaged in protected speech.

---

testimony in their brief, any argument regarding these statements is abandoned. *Thaddeus–X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (en banc).

In sum, the district court did not err in granting summary judgment for the defendants on the political-speech retaliation claims of Erskine, Hall, and Perttunen or in concluding that Dye engaged in protected speech.

## C. Political-Affiliation Retaliation Claim

The stewards contend that the district court erred in granting summary judgment for the defendants on the basis that none of the stewards had established that they were affiliated with the Republican Party or gubernatorial candidate DeVos. Appellants Br. at 25. Specifically, they argue that the district court improperly applied the protected-speech retaliation standard when evaluating the political-affiliation retaliation allegations. *Id.* at 30. The defendants rejoin that the stewards did not provide sufficient evidence to support a claim of protected-speech or political-affiliation retaliation and that the district court engaged in the correct analysis. Appellees Br. at 37.

### 1. Political-Affiliation Retaliation Claim Standard

The district court framed the political-affiliation allegations as those arising under a retaliation claim; however, it then stated the basic principles of the political-patronage dismissal standard—that taking adverse employment actions based on political affiliation is unconstitutional under the First Amendment unless there exists a vital governmental interest in doing so. *Dye*, 2011 WL 2144485, at *12. When it turned to its analysis, the district court appeared to apply the retaliation standard that it had outlined in the protected-speech portion of its order. *Id.* at *13. It is thus unclear which standard the district court applied because under each test, a plaintiff must show that he was adversely affected as a result of engaging in protected First Amendment activity. This issue was the only one reached by the district court in this portion of its opinion.

Under either standard, the district court erred. The court summarily determined that "[t]o the extent Plaintiffs' association/ affiliation claim arises from their political speech concerning the 2006 gubernatorial election, those claims are addressed above."

*Id.* The court then concluded that because plaintiffs cannot show that White or Post knew about their affiliation with the Republican Party, their political-affiliation retaliation claim fails. *Id.* When utilized properly, however, the two standards can produce distinct conclusions. For example, while an individual's improper campaigning during work hours may not be protected speech, it certainly could alert those who heard the speech of his political affiliation, thereby fulfilling part of the political-affiliation standard. Therefore, the district court erred in assuming that reviewing the same evidence to determine if the stewards engaged in a different protected activity would necessarily result in the same conclusion.

Moreover, the district court erred in its analysis of the stewards' perceived political-affiliation retaliation allegations by concluding that actual affiliation is required. *Id.* at *12 n.8. At issue is whether an individual claiming to have been retaliated against because of her political affiliation must show that she was actually affiliated with the particular political group or candidate. Here, as will be shown in greater detail below, the stewards have put forth evidence demonstrating that White and Post operated under the assumption that each of the stewards was affiliated with DeVos and the Republican Party.

We have not yet addressed whether actual affiliation is required for First Amendment political-affiliation retaliation claims. The First Circuit squarely addressed this issue in *Welch v. Ciampa*, 542 F.3d 927 (1st Cir. 2008), a case in which an employee alleged that the defendants attributed to him an affiliation and retaliated against him as a result. *Id.* at 938–39. The court discussed the evidence put forth by the employee as follows: "But neither active campaigning for a competing party nor vocal opposition to the defendant's political persuasion are required. In this case, Welch adduced evidence that officers who did not support the recall election were perceived as opposing it." *Id.* at 939. The First Circuit then concluded that "[w]hether Welch actually affiliated himself with the anti-recall camp is not dispositive since the pro-recall camp attributed

to him that affiliation." *Id.* The court further explained that although active support for a political group would help an employee meet his evidentiary burden, such a showing is not required in order to guarantee First Amendment protections. *Id.*

The Tenth Circuit has also recognized that the critical inquiry in certain political-affiliation retaliation cases is the motivation of the employer, stating that the "only relevant consideration is the impetus for the elected official's employment decision vis-a-vis the plaintiff, i.e., whether the elected official prefers to hire those who support or affiliate with him and terminate those who do not." *Gann v. Cline*, 519 F.3d 1090, 1094 (10th Cir. 2008). Moreover, *Gann* expressly rejected two concerns raised by the defendant: "that it was impossible for Ms. Gann's apolitical status to constitute a substantial or motivating factor in his decision to discharge her because Ms. Gann never made her political non-affiliation known to him" and that affording relief in this case would "sanction[] future patronage claims by any public employee who keeps her political beliefs private but suffers from an adverse employment decision." *Id.* The Tenth Circuit discredited these arguments by reiterating the well-established principle that "a plaintiff must establish a causal link between the plaintiff's political beliefs, or lack thereof, and the defendant's adverse employment decision with respect to the plaintiff." *Id.* The court further explained that "[t]here are, of course, many ways to establish such a link beyond requiring a plaintiff to tell her boss that she does not subscribe to his political beliefs." *Id.*

The Third Circuit, however, has rejected a perceived-support theory, stating that "Plaintiffs in First Amendment retaliation cases can sustain their burden of proof only if their conduct was constitutionally protected." *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 495 (3d Cir. 2002). The court relied upon the following statement in *Waters*: "[w]e have never held that it is a violation of the Constitution for a government

employer to discharge an employee based on substantively incorrect information." *Ambrose*, 303 F.3d at 495 (quoting *Waters*, 511 U.S. at 679).**5**

An application of this principle in *Waters* to the First Amendment context, however, is disingenuous. When read in context, it is clear that this sentence relates only to due-process violations. In fact, the subsequent sentence references directly the due process afforded public employees: "Where an employee has a property interest in her job, the only protection we have found the Constitution gives her is a right to adequate procedure." *Waters*, 511 U.S. at 679. Moreover, we have previously recognized this principle as one concerning due process: "[i]n *Waters*, a plurality of the Supreme Court held the *Connick* test should be applied to what the government reasonably thought was said, i.e. the government should not be held to the same evidentiary standards used by a jury when making its decision whether or not to terminate an employee based on what is thought to be unprotected speech." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1189 n.9 (6th Cir. 1995). Given the plain meaning of *Waters*, along with our prior interpretation of its holding, we find the Third Circuit's conclusion unpersuasive.

For the reasons stated, we adopt the reasoning of the First and Tenth Circuits and hold that retaliation based on perceived political affiliation is actionable under the political-affiliation retaliation doctrine.

---

**5**Several circuits have stated similar principles to those propounded by the Third Circuit, yet only with respect to protected speech. *Wasson v. Sonoma Cnty. Junior College*, 203 F.3d 659, 663 (9th Cir. 2000) ("Accordingly, there can be no First Amendment claim when an employee is falsely accused of making statements uttered by someone else."); *Jones v. Collins*, 132 F.3d 1048, 1053 (5th Cir. 1998) ("[R]etaliation based on this perception, in the absence of any actual expression by Jones that is subject to First Amendment protection, does not constitute a constitutional violation."); *Barkoo v. Melby*, 901 F.2d 613, 619 (7th Cir. 1990) ("To the extent Barkoo alleges that her employers retaliated against her because they *thought* she was engaged in First Amendment protected speech on an issue of public concern, we reject the notion that this allegation brings her claim within the requirements of § 1983."). Because perceived political-affiliation retaliation is the only issue before us now, we do not reach the question whether a plaintiff can allege a protected-speech retaliation claim. *See Welch*, 542 F.3d at 938–39 (finding an actionable political-affiliation retaliation claim where political affiliation was attributed to the plaintiff, yet on the same facts concluding that the plaintiff did not show "an actionable violation of his right to free speech").

### 2. Analysis

In arguing that the stewards were affected adversely because of their political affiliation with the Republican Party, the stewards focus heavily on the culture of the workplace. The stewards paint a picture of a state agency divided by political affiliation, in which White, a Democrat, retaliates and otherwise treats poorly those who do not support her or then-Governor Granholm. Appellants Br. 40–47. In support of this argument, the stewards present evidence applicable to all stewards and evidence concerning specific stewards.

The strongest evidence in support of retaliation against all stewards on the political-affiliation basis is the stewards' description of a meeting on January 4, 2007, that was attended by White, Post, Dye, Erskine, Hall, Perttunen, and Pete O'Hare, another steward.[6] The stewards argue that White "accused them of supporting Dick DeVos in the 2006 Michigan Gubernatorial election . . . . [and of] trying to derail her confirmation hearing by trying to convince others to vote for Republican candidate Dick DeVos."[7] *Id.* at 16. Erskine stated: "She knew we voted for DeVos because she said we voted for DeVos and, in turn to get rid—to bring a republican in, to get rid of her because she's democrat [sic]." R. 50-1 (Erskine Tr. at 110:16–19) (Page ID #890). Erskine continued that Post "made the statement that, because we wrote our senators and our governor against her confirmation hearing, that until we conformed to her ways, we weren't going to get nothing [sic]." *Id.* at 111:7–12. Hall reiterated this description of the meeting: "In a meeting with the commissioner, [Post] indicated one of the reasons for losing our banked days is because we supported DeVos." R. 47-7 (Hall Tr. at

---

[6]The argument that the stewards' claim fails because a fifth steward was present at this meeting is unavailing. The evidence shows that White and Post attributed a political affiliation to each of the five stewards, including the four involved in this case, and we do not need to inquire as to why O'Hare is not a party to this action.

[7]The second part of this argument is illogical. The confirmation hearing preceded the gubernatorial election by one year. This hearing could not have been derailed by convincing members of the agency to vote for DeVos.

62:7–9) (Page ID #416).  Perttunen similarly testified that "[i]n that meeting at Sports Creek in January, it was told to us by Christine White and Gary Post, due to us supporting Mr. DeVos, they would be taking away our banked time, and until we conformed to her ways, we would not be getting it back."  R. 47-6 (Perttunen Tr. at 57:17–21) (Page ID #371).[8]

Additionally, the stewards provide affidavits of other employees of the ORC detailing the political culture of the agency and White's treatment of non-Democrats. The district court summarily dismissed every affidavit produced by the stewards in a single footnote, stating "[a]ffidavits that state Defendant White created a hostile work environment yet fail to set out facts showing that the hostility was because of political speech or association do nothing to advance Plaintiffs' First Amendment retaliation claim."  *Dye*, 2011 WL 2144485, at *13 n.11.  Although certain affidavits are insufficient in this regard,[9] this description is not true of every affidavit presented.  For example, Brian Brown, a regulation agent at the ORC from 1998 to 2009 states that "[d]uring my time with the ORC, I witnessed Christine White and Gary Post create a work environment based on favoritism based on political patronage," that "[e]mployees with similar political ideals would receive more hours, access to promotions, and overall favorable treatment," and that "[d]uring meetings with Gary Post, he would make clear his animosity toward the Plaintiff group."  R. 49-8 (Brown Aff. at ¶¶1–5) (Page ID #635–36).  Brown also states that during meetings, Post would say that "'he did not trust the stewards'" and would "make clear his animosity toward the Plaintiff group."  *Id.*

---

[8]The stewards also reference an alleged meeting that occurred in October 2006.  Appellants Br. at 14.  Appellants argue that all four stewards were present when Post made statements that Granholm was the way to go and also when Post accused Hall and Erskine of attempting to have White removed by convincing individuals to vote for DeVos.  *Id.*  Although this argument is made repeatedly in their brief, the stewards provide no evidence of this meeting having occurred.  The stewards point to Dye's deposition testimony in which he describes the conversations he had with Post in the fall of 2006 for support and to the allegations in the Second Amended Complaint.  Neither of these provide the requisite evidentiary basis for this alleged meeting.

[9]For example, Martin Vandevelde describes alleged apolitical and non-speech related actions taken against him by White and Post.  R. 49-10 (Vandevelde Affidavit) (Page ID #640–642).

¶¶ 5–6 (Page ID #636). Richard Jewell, an investigative supervisor at the ORC, declared that "[i]f employees did not support [White and Post] on any issue, the employees would be harassed and subject to a hostile work environment" and that "[a]pproximately one year into [White's] appointment, [Post] stated to me that 'those stewards need to get on the same page as her' referring to [White]. He meant not only philosophically on the same page, but politically." R. 49-9 (Jewell Aff. at ¶¶ 1–4) (Page ID #638–39). These affidavits corroborate the deposition testimony of the stewards.

There is also evidence that White and Post perceived an affiliation with DeVos and the Republican Party specific to certain stewards. To begin, Dye's conversations with Post and other coworkers concerning the gubernatorial election would make known his political affiliation. Dye testified at his deposition that in the fall of 2006, prior to the gubernatorial election, he would "have occasion to go to lunch downstairs in the office and it was discussed that racing, by Mr. Post would say or did say that we are much better off with Granholm than we would be with DeVos." R. 47-5 (Dye Tr. at 36:4–9, 41:1–10) (Page ID #319–20). Dye continued that "[m]y statements would be DeVos is republican, is a business person and I think the state needs a business person into it. So we had occasion to discuss that issue." *Id.* 36:10–13 (Page ID #319). Dye also explained that as part of conversations in the office, he would tell others that DeVos was better because of his business background. *Id.* 42:6-22. (Page ID #321). Erskine's deposition testimony corroborates Dye's assertion that Post would speak in support of Granholm around the office: "[Post] talked about Jennifer Granholm was the way to go [sic] if the horsemen felt they could get the slot machines in to help them with racing, to pick up better purse pools." R. 50-1 (Erskine Tr. at 108:6–9) (Page ID #888).

The district court appears to have denied Dye's claim because Dye never affirmatively stated that he was a member of the Republican Party. *Dye*, 2011 WL 2144485, at *13. This is a rigid interpretation of the evidence; from these discussions, Post easily could have inferred an affiliation with the Republican Party and support for

DeVos. *See Murphy v. Cockrell*, 505 F.3d 446, 452 (6th Cir. 2007) ("[S]upport for a political candidate falls within the scope of the right of political association.") (internal quotation marks omitted); *Gann v. Cline*, 519 F.3d 1090, 1094 (10th Cir. 2008) ("There are, of course, many ways to establish such a link beyond requiring a plaintiff to tell her boss that she does not subscribe to his political beliefs.").

Additionally, although the speech that Hall engaged in was not protected, it certainly alerted White and Post to Hall's political affiliation. Moreover, White brought Hall's campaigning to the attention of the other stewards as an example of inappropriate speech in the January 4, 2007 meeting. Erskine's deposition testimony reflects that she did not discuss politics at work, yet she testifies that she was grouped in with those who had expressed support for DeVos: "I did not tell anybody to vote, nor pursue that. . . . She knew we voted for DeVos because she said we voted for DeVos." R. 50-1 (Erskine Tr. at 109:19–110:19) (Page ID #889–90).

There is ample evidence to support the stewards' contention that Post and White attributed a political affiliation to the stewards, especially at the prima facie stage. An employer that acts upon such assumptions regarding the affiliation of her employees should not escape liability because her assumptions happened to be faulty.

### III. ADVERSE EMPLOYMENT ACTIONS

The stewards allege that numerous adverse actions were taken against them because they engaged in protected speech and were assumed to be affiliated with the Republican Party. Certain actions, such as demotions and terminations, relate to specific stewards. The remainder are alleged as actions taken against every steward. The district court categorized the actions in the following manner:

> (1) the Fall 2006 decision to eliminate the position of Administrative Liaison Steward; (2) the decrease in assigned work days (and thus pay) for Plaintiffs; (3) the adoption of stricter timekeeping procedures, including (a) the scheduling and authorization of full days versus half

days, and (b) the elimination of the practice of "banking time" in a pay period outside the period work was performed; (4) the elimination of travel expense reimbursements in connection with the Harness Stewards' bi-annual certification conference in November 2006 and 2008; and (5) the elimination of two Harness Stewards—Plaintiffs Dye and Erskine—in June 2009.

*Dye*, 2011 WL 2144485, at \*13.  As we discuss more fully below, the district court implicitly or explicitly concluded that many of these actions constituted adverse employment actions, and the defendants do not challenge these determinations in their brief.  In such instances, we will not consider the merits of categorizing these alleged actions as adverse and will instead continue on to evaluate whether the district court was correct in its causal-connection analysis.

In a First Amendment retaliation claim, we must consider whether the alleged adverse employment action "would chill or silence a person of ordinary firmness from future First Amendment activities."  *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007) (internal quotation marks omitted).  "The term 'adverse action' has traditionally referred to actions such as discharge, demotions, refusal to [h]ire, nonrenewal of contracts, and failure to promote." *Handy-Clay v. City of Memphis*, --- F.3d ----, 2012 WL 4352228, at \*11 (6th Cir. Sept. 25, 2012) (internal quotation marks omitted) (alteration in original).  However, we also recognize that "we are required to tailor[] our analysis under the adverse action prong to the circumstances of this specific retaliation claim." *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005).

## A.  Dye's Demotion

Dye's demotion from Administrative Liaison Steward to state steward constituted an adverse employment action.  *See Eckerman*, 636 F.3d at 208 ("[T]he district court found, and we agree, that the demotion from lieutenant to sergeant alone constitutes sufficient adverse action to satisfy this element of plaintiff's retaliation claim.").  The

defendants do not dispute this characterization and instead focus their arguments on the causal-connection element. Appellees Br. at 51.

**B. Dye's and Erskine's Terminations**

It is elemental that terminations are adverse employment actions. *See v. City of Elyria*, 502 F.3d 484, 494 (6th Cir. 2007) (concluding that when terminated, "See undeniably suffered an adverse action that would chill the free speech rights of an ordinary person"). The parties do not dispute this characterization. Appellees Br. at 54–55.

**C. Decrease in Work Days and Pay**

A decrease in work days and pay is an adverse employment action. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 710–11 n.6 (6th Cir. 2007) ("We fail to understand how a loss of pay is anything other than an adverse employment action, regardless of the form in which the deprivation occurred."); *see also Miller v. City of Canton*, 319 F. App'x 411, 419 (6th Cir. 2009) ("Although he was later made whole in December 2005, a reasonable jury could find that the loss of pay for sixty days would constitute a hardship to the average officer and would chill the exercise of First Amendment rights."). The parties do not dispute that this is an adverse employment action, and the district court did not reach this issue. Appellees Br. at 51–53.

**D. Half-Day Employment**

Although the district court concluded that the stricter timekeeping measures requiring advance authorization to extend a scheduled half day at the race track to a full day was not an adverse action, *Dye*, 2011 WL 2144485, at *20, the stewards have waived review of this issue by not raising it in their brief or at oral argument. *Thaddeus–X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (en banc).

**E.  Banked-Time System**

On January 4, 2007, White discontinued the use of the banked-time system.  The banked-time system enabled an employee to reserve receipt of payment on any time worked in excess of ten full days in a fourteen-day period.  The employee could then fill in a pay period where he worked less than ten full days with these banked days.  As explained by Post, "[f]or example, if a Harness Steward worked 11 days in [a] two week pay period, they would submit 10 days for payment on their timesheet, and put one day in the 'bank.'"  R. 47-4 (Post Aff. at ¶ 13) (Page ID #301).  Essentially, by choosing to bank time, the employee was electing to receive compensation for time worked in a more evenly distributed manner throughout the year, akin to the compensation structure of a salaried employee.

We have addressed the concept of banked time in the context of retaliation under the Fair Labor Standards Act.  *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482 (6th Cir. 2006).  In *Adair*, the plaintiffs alleged that a freeze on the use of banked time constituted an adverse employment action.  *Id.* at 490.  Under the freeze, "Plaintiffs simply were required to utilize vacation days for just that—vacation—rather than permitted to save vacation time and later exchange it for pay."  *Id.*  Because "[t]his did not result in a material loss of benefits, termination, demotion, transfer, or alteration of job responsibilities," we held that the plaintiffs had failed to show that freezing the use of banked time was an adverse employment action.  *Id.*

Given that we use a distinct standard in First Amendment retaliation claims, *Adair* can instruct us only in a limited manner.  In a First Amendment retaliation claim, we must ask whether the alleged action would chill or silence a person of ordinary firmness.  The stewards have provided evidence that the banked-time program was a key benefit to these stewards.  Although White and Post changed the structure of compensation in a way that would not inflict any potential monetary losses, as would typically be required under the FLSA, it certainly imposed a different type of financial

burden on the stewards. The lack of a steady income, especially when combined with the decrease in racing days, could certainly chill or silence a person of ordinary firmness. Moreover, as is explained more fully below, *see infra* Part IV.E, there is evidence in the record that White discontinued this program in order to silence the stewards. We therefore find that the district court erred with respect to the banked-time system.

## F. Travel-Expense Reimbursements

The district court did not discuss whether the decision to discontinue the practice of reimbursing the stewards for travel expenses when they attended biannual certification conferences constituted an adverse employment action. *Dye*, 2011 WL 2144485, at *23. Instead, the district court concluded that the stewards did not establish a causal connection between the elimination of travel-expense reimbursements and the protected activity. *Id.* However, we decline to reach either aspect of the district court's analysis, as the stewards have waived review of both issues by not raising either in their brief or at oral argument.[10] *Thaddeus-X*, 175 F.3d at 403 n.18.

## IV. CAUSAL CONNECTION

The stewards argue that the district court erred in concluding that none of the adverse employment actions were effectuated because of the protected activity. "In order to establish a causal connection between the protected conduct and the adverse action, plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse employment action] would not have occurred but for his engagement in protected activity." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010). "A causal link can be shown through direct

---

[10] In their statement of facts, the stewards describe the following events: "On November 12 through November 15, 2006, Plaintiffs participated in a biannual continuing education conference for stewards, located in Louisville, Kentucky. On all previous conference trips, Plaintiffs were reimbursed for their travel expenses. When Plaintiffs returned from this trip in November 2006, they were told that their expenses would not be reimbursed." Appellants Br. at 15–16 (internal citations omitted). However, the stewards do not even reference these facts in their legal argument or in the section of their brief detailing the genuine issues of material fact.

or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action that may create an inference of causation." *Id.* Moreover, we have determined that incidents of misconduct that do not rise to the level of an adverse employment action "may be relevant at trial to show a pattern of mistreatment on the job based on plaintiff's protected activities." *Id.* at 208–09.

## A. Dye's Demotion

The stewards argue that the temporal proximity between Dye's protected activity and his demotion satisfies the causal-connection element of his First Amendment retaliation claim. Dye's protected activity—the conversations with Post regarding the gubernatorial election and the perceived political affiliation stemming from those conversations—both occurred in the fall of 2006, prior to the election. Post averred that he informed Dye of his demotion at some point between October 11, 2006, the date on which Post was appointed Deputy Commissioner, and November 8, 2006, the date on which Dye's administrative duties in the Lansing office ceased. In this meeting, Post informed Dye that his demotion would take effect at the expiration of his contract on December 31, 2006, and that his duties in the Lansing office would cease on November 8, 2006. Dye testified that he discussed the gubernatorial election with Post in the fall of 2006, prior to November 7, 2006, the date of the election. At the very earliest, then, these discussions occurred on some date in September 2006, when Post was finishing his duties as the contract management consultant. Although we do not have a specific date for either the political discussions or the meeting regarding the demotion, the notice of demotion must have occurred within two months, if not sooner, of the protected activity.

In *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008), we clarified that temporal proximity alone can, in certain circumstances, suffice to show a causal connection in a retaliation case: "Where an adverse employment action occurs very

close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.* at 525. We also recognized the limitations to using temporal proximity alone—that "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

As we explained in *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007), and recently reiterated in *Gambill v. Duke Energy Corp.*, 456 F. App'x 578, 589 (6th Cir. 2012), "this Court has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity." A lapse of two months, as is the case here, is sufficient to show a causal connection, and the district court erred in holding otherwise. *See, e.g.*, *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) ("We agree with the district court that the nearness in time between Seeger's return from FMLA leave and his termination—three weeks after his reinstatement and less than two months after he first notified CBT of his medical leave—suffices in these circumstances to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge."); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (explaining that three months is sufficient to show temporal proximity because "a plaintiff's burden in establishing a prima facie case is not intended to be an onerous one") (internal quotation marks and alterations omitted); *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (concluding that a lapse of three months is a sufficient temporal proximity to show causal connection).

## B. Dye's and Erskine's Terminations

The stewards also argue that the district court erred in concluding that the stewards failed to show a causal connection between the protected activity and the June

2009 terminations. As with Dye's demotion, the stewards rely wholly on temporal proximity to show a causal connection. The protected activity at issue began in the lead-up to the 2006 gubernatorial election and ended, when viewing the facts in the light most favorable to the stewards, in the winter of 2007. Both Dye and Erskine were fired in June of 2009, more than two years after the protected conduct.

A lapse of more than two years between the protected activity and the adverse employment action is simply insufficient to show a causal connection based solely on a temporal-proximity theory. *Dixon*, 481 F.3d at 334 ("[T]he Supreme Court held that a finding of causal connection was not warranted where, among other things, almost two years elapsed between the employee's participation in protected activity and the adverse employment decision.") (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). Because the stewards do not proffer any additional evidence, we conclude that the stewards fail to show a causal connection as to the terminations.

## C. Decrease in Work Days and Pay

The district court granted the defendants' motion on this portion of the stewards' claims on two bases: (1) the stewards' failure to show a causal connection and (2) the convincing evidence proffered by the defendants in support of a legitimate reason to take this action. On appeal, however, the stewards argue only that the district court erred in concluding that the defendants had a legitimate reason to decrease the work days and pay. Appellants Br. at 43–46. Such an argument ties our hands. It is a basic tenet in retaliation claims that the burden shifts to the employer only after the employee has established a prima facie case. Countering the defendants' proffered reasons, as is done in the stewards' brief, does not establish a prima facie case. Under this framework, we cannot consider the accuracy of the district court's determination that the defendants established legitimate reasons to take these employment actions unless the stewards have first met their burden of showing a causal connection. Because the stewards have not

even referenced the prima facie case in their brief, let alone a specific theory upon which they rely, we must affirm the district court on this portion of its order.

## D.  Banked-Time System

The stewards presented evidence that White and Post eliminated the practice of banking days because of the stewards' perceived affiliation with the Republican Party. Perttunen testified that "[i]n that meeting at Sports Creek in January, it was told to us by Christine White and Gary Post, due to us supporting Mr. DeVos, they would be taking away our banked time, and until we conformed to her ways, we would not be getting it back." R. 47-6 (Perttunen Tr. at 57:17–21) (Page ID #371).  Hall also testified that "[i]n a meeting with the Commissioner, he indicated one of the reasons for losing our banked days is because we supported DeVos." R. 47-7 (Hall Tr. at 62:7–9) (Page ID #416). Further, Hall recalled that each of the four plaintiffs in this case was present at that meeting, as well as another steward, Post, and White. *Id.* at 63:24–63:3 (Page ID #416–17); *see also* R. 50-1 (Erskine Tr. at 111:1–3) (Page ID #890) (stating these individuals were present at the meeting).

Moreover, there is a temporal connection nearly identical to that involved in Dye's demotion.  White and Post announced the change in the banked-time system at the January 4, 2007 meeting, just two months after the gubernatorial election.  Therefore, we conclude that the stewards have established a prima facie case for the loss of the banked-time system.

## V.  DEFENDANTS' PROFFERED NON-DISCRIMINATORY REASONS

Once the stewards have established a prima facie case, the burden shifts to the defendants, who must show by a preponderance of the evidence that "the employment decision would have been the same absent the protected conduct." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (internal quotation marks omitted). The stewards were successful in establishing a prima facie case on two adverse

employment actions:  Dye's demotion on the basis of his political speech and political affiliation and the stewards' loss of the banked-time system on the basis of political affiliation.

## A.  Evidentiary Objection

The defendants rely upon Post's affidavit, White's deposition testimony, and Post's deposition testimony to demonstrate that they would have made the decision to demote Dye absent the protected activity.  The stewards object to the use of Post's post-deposition affidavit as a violation of their Fourteenth Amendment due-process right, arguing that Post introduced statements in this affidavit that were directly responsive to questions that he had already answered in his deposition testimony.  Appellants Br. at 31–33.  The stewards specifically object only to the portions of Post's affidavit concerning the reasons behind Dye's and Erskine's terminations.  Because we have held that the stewards have not established a causal connection for these adverse employment actions, we do not need to review the district court's use of the affidavit in this manner.  Insofar as the stewards attempt to make a blanket objection to the entire affidavit, their objection is insufficient.  Merely pointing out that an affidavit was made after the deposition does not render the entire affidavit improper.  Rather, the stewards must show that the affidavit directly contradicts the deposition testimony or that the affidavit was effectuated for the purpose of creating a sham issue of fact.  *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908–09 (6th Cir. 2006).  They have not shown either.

## B.  Dye's Demotion

The defendants argue that they demoted Dye "for budgetary reasons and certain functions were being reassigned to [Post]."  Appellees Br. at 9.  In support of this argument, the defendants cite White's deposition testimony, in which she states the decision was made "based on the fact that [Post] felt that he could do those

responsibilities." R. 47-2 (White Tr. at 87:12–15) (Page ID #282). The defendants also rely on the statement in Post's affidavit in which he avers as follows:

> The Racing Commissioner determined, and I agreed that the amount and type of work required could no longer justify the full time position of Administrative Steward in the Lansing office. There was simply not enough work to justify the continued cost of the position. Additionally, budget concerns required an examination of how staff were being utilized and the best use of that staff. Many of the tasks at an administrative level, such as policy writing, scheduling and budget development, require excellent writing skills and proficiency with electronic spreadsheets, for example.

R. 47-4 (Post Aff. ¶ 8) (Page ID #297–98). Post also avers that Dye did not have the necessary computer or writing skills for the position, a less convincing statement given that there is also evidence on the record indicating that Dye had been the Administrative Steward for eight years at that point. *Id.* The defendants also point to Dye's deposition testimony, in which he states that Post provided the reason for his demotion as "[b]udgetary concerns." R. 47-5 (Dye Tr. at 29:12–17) (Page ID #317).

Although the defendants provide evidence in support of their proffered reason for Dye's demotion, this evidence is nonetheless insufficient to show that no reasonable juror could fail to return a verdict for Dye. The temporal proximity of the demotion and the protected speech, as well as the testimony concerning the political atmosphere of the agency leading up to the gubernatorial election, create a genuine issue of material fact as to the reason behind Dye's demotion. Moreover, in the First Amendment context, "[a] defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury." *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010). The district court thus erred in granting the defendants' motion for summary judgment on Dye's retaliation claim.

## C. Banked-Time System

The defendants argue that they eliminated the banked-time system because they "were concerned about the appropriateness, accountability, and lack of management oversight for this process." Appellees Br. at 18. In support of this argument, the defendants present Post's affidavit, in which he explains that he and White "were concerned about the appropriateness, accountability and lack of management oversight of this process and after discussing it with the Commission's Human Resources Director, the decision was made to discontinue this practice." R. 47-4 (Post Aff. at ¶ 13) (Page ID #301). The defendants also rely upon White's deposition testimony, in which she denies making any statement that she eliminated the banked-time system because of the stewards' political affiliation.

The district court concluded, that based on this evidence, no reasonable juror could find for the stewards. *Dye*, 2011 WL 2144485, at *23. We disagree. The totality of the evidence shows that there is a credibility determination to be made by the factfinder as to whether White stated that she was eliminating the banked-time system on the basis of the stewards' political affiliation. White's deposition testimony, coupled with Post's broad explanation in his affidavit, does not require a reasonable juror to find for the defendants. We therefore conclude that a genuine issue of material fact exists as to the banked-time system.

## VI. CONCLUSION

For the reasons stated above, we reverse the district court on Dye's protected-speech and political-affiliation retaliation claims, and on each steward's political-affiliation retaliation claim based on the loss of the banked-time system. We affirm the district court on Erskine, Hall, and Perttunen's protected-speech retaliation claims and on each of the stewards' remaining political-affiliation retaliation claims.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

McKEAGUE, Circuit Judge.  I agree with the majority that the district court appropriately granted summary judgment on Erskine's, Hall's, and Perttunen's protected speech claims, and as to the bulk of plaintiffs' political-affiliation claims.  But the majority also concludes that an individual's perceived affiliation with a political party can form the basis of a First Amendment retaliation claim, and that in this case, all four plaintiffs have established questions of fact as to whether their perceived affiliation with the Republican Party motivated defendants' decision to take away their banked-days. The majority further concludes that there are material questions of fact with respect to plaintiff Dye's First Amendment protected speech claim.  Because the majority's conclusion that an individual's perceived political affiliation should receive First Amendment protection is not supported by political affiliation case law, and because Dye's protected speech claim hangs entirely on a very thin temporal thread, I respectfully dissent.

### I.

A plaintiff-employee seeking to establish a prima facie case of retaliation under the First Amendment must point to evidence sufficient to establish three elements: 1) the plaintiff engaged in a constitutionally protected activity; 2) an adverse action was taken against the plaintiff that caused him or her to suffer an injury that would deter a person of ordinary firmness from continuing to engage in the conduct; and 3) the adverse action was motivated at least in part by the plaintiff's protected activity.  This standard applies in both protected speech retaliation claims and in political affiliation retaliation claims not brought under the political patronage dismissal doctrine.  *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 207 (6th Cir. 2010) (finding protected conduct for purposes of

a political affiliation claim where plaintiff publicly supported Republican candidates with signs, bumper stickers, attendance at rallies and monetary donations).

If the plaintiff succeeds in establishing these three elements, then the defendant must show that he would have made the same decision in the absence of the protected conduct. *Id.* at 208. Summary judgment is warranted if, "in light of the evidence . . . no reasonable juror could fail to return a verdict for the defendant." *Id.* If the defendant meets his or her burden, that is the end of the inquiry, and the burden does not then shift back to the plaintiff to prove pretext. *Helwig v. Pennington*, 30 F. App'x 516, 519 (6th Cir. 2002).

We have recognized that under the Supreme Court's political patronage cases, "[t]he right of political association is well established as falling within the core of activities protected by the First Amendment." *See Sowards v. Loudon County*, 203 F.3d 426, 432 (6th Cir. 2000) (concluding there was protected political affiliation activity supporting a First Amendment retaliation claim where plaintiff was supporting her husband's campaign for office). We have also recognized that "[s]upport of a political candidate falls within the scope of the right of political association." *Id.* (citing *Elrod v. Burns*, 427 U.S. 347, 356-57 (1976)).

Applying these standards here, plaintiffs Dye and Hall can likely satisfy the first prong of the prima facie test in that each of them engaged in conduct from which defendants could conclude they were affiliated with the Republican Party (Dye by speaking directly to defendants about his affinity for the Republican candidate and Hall by campaigning for the Republican candidate at the racetrack). This conclusion is based on the fact that they engaged in constitutionally protected conduct by speaking out about their particular political leanings.

By contrast, neither plaintiff Erskine nor Pertunnen engaged in any such conduct. In fact, they expressly denied that they did.[1] Yet the majority concludes that defendants' alleged perception that Erskine and Pertunnen were affiliated with the Republican Party is enough to satisfy plaintiffs' burden of establishing that they engaged in protected activity. Because the Supreme Court has not spoken directly on this issue, and because the case law is ambiguous with respect to whether such a claim is cognizable, we should not expand the scope of First Amendment protections to this as yet unrecognized context.

The Supreme Court's political affiliation cases, relied on by this Court in First Amendment retaliation cases like *Eckerman* and *Sowers*, are silent on whether perceived political affiliation, without more, is protected First Amendment activity. As described by the *Elrod* plurality, the unacceptable behavior these cases sought to rectify was the restraint patronage practices place on freedoms of belief and association. 427 U.S. at

---

[1]Pertunnen testified:

Q: Did you support Dick DeVos?
A: No.
Q: Did you make a campaign contribution to Dick DeVos?

 * * *
A: No.
Q: Did you have a bumper sticker for Dick DeVos on your car?
A: No.

(Pertunnen Dep., Page ID # 373).

Similarly Erskine testified:

Q: Did you ever tell Mr. Post that you did not support Jennifer Granholm but that you supported Dick DeVos?
A: No.
Q: Did you ever tell Commissioner White that you supported Dick DeVos and not Jennifer Granholm?
A: No. She just assumed that.
Q: How do you know she assumed that?
A: Because of what she said in a meeting we had.
Q: So I understand, though, you at no time ever told her your political views or who you supported for the gubernatorial office?
A: No.
Q: And the same thing with respect to Gary Post?
A: Correct.

(Erskine Dep., Page ID #461).

355. Accordingly, all of the cases involved some type of coercive requirement that employees affiliate with a particular political party in order to avoid an adverse employment action. *See Elrod*, 427 U.S. at 355 ("In order to maintain their jobs, respondents were required to pledge their political allegiance to the Democratic Party, work for the election of other candidates of the Democratic Party, contribute a portion of their wages to the Party, or obtain the sponsorship of a member of the party, usually at the price of one of the first three alternatives."); *Branti v. Finkel*, 445 U.S. 507, 509 (1980) ("With one possible exception, the nine [individuals] who were to be appointed or retained were all Democrats and were all selected by Democratic legislators or Democratic town chairmen on a basis that had been determined by the Democratic caucus. The District Court found that Finkel and Tabakman had been selected for termination solely because they were Republicans and thus did not have the necessary Democratic sponsors[.]"); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 66 (1990) ("In reviewing an agency's request that a particular applicant be approved for a particular position, the Governor's Office has looked at whether the applicant voted in Republican primaries in past election years, whether the applicant has provided financial or other support to the Republican Party and its candidates, whether the applicant has promised to join and work for the Republican Party in the future, and whether the applicant has the support of the Republican Party officials at state or local levels.").[2]

Two circuit courts have relied on these patronage cases as a basis for concluding that government employers cannot take adverse employment actions against politically unaffiliated employees solely because the employees were politically unaffiliated or perceived as being unaffiliated with the party in power. *See Welch v Ciampa*, 542 F.3d 927 (1st Cir. 2008); *Gann v. Cline*, 519 F.3d 1090, 1094 (10th Cir. 2008). The majority

---

[2]The patronage cases also recognize that the First Amendment protects employees who elect not to affiliate with any party. *See Rutan*, 497 U.S. at 76 ("The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate."). None of the plaintiffs in this case have claimed defendants were interfering with their right not to affiliate.

here relies on *Welch* and *Gann* to argue that in this case defendants' mere perception of plaintiffs Erskine and Pertunnen as Republican is enough to satisfy the protected activity prong of the prima facie test.

By contrast, in *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 495 (3d Cir. 2002), the Third Circuit clearly rejected what it termed a "perceived support" theory. In that case, officials discussed the plaintiff's alleged actions in stealing files to support a colleague who had filed a lawsuit against the employer. The plaintiff in part alleged that adverse action was taken against him because the employer believed he was supporting the colleague even though the plaintiff did no such thing and even denied that he did. The court rejected this "perceived support" theory arguing "[p]laintiffs in First Amendment retaliation cases can sustain their burden of proof only if their conduct was constitutionally protected, and, therefore, *only if there actually was conduct*." *Id.* (citing *Fogarty v. Boles*, 121 F.3d 886, 890 (3d Cir. 1997) (emphasis added).

In justifying its conclusion, the court relied primarily on several protected speech cases. *See, e.g., Fogarty*, 121 F.3d at 890 (holding that principal's mistaken belief that teacher had engaged in protected conduct, when teacher had not engaged in any conduct at all, could not support First Amendment retaliation claim); *Wasson v. Sonoma Cnty. Junior Coll.*, 203 F.3d 659, 663 (9th Cir. 2000) ("[T]here can be no First Amendment cause of action where there was no speech by the plaintiff." "[A] plaintiff must demonstrate that she has engaged in constitutionally protected expression to establish a First Amendment retaliation claim."); *Jones v. Collins*, 132 F.3d 1048, 1050-51 (5th Cir. 1998) (no protected conduct where school principal was alleged to have leaked information and was transferred as a result, but never really leaked the information and denied doing so); *Barkoo v. Melby*, 901 F.2d 613 (7th Cir. 1990) (concluding there was no protected conduct where plaintiff claimed her employer retaliated against her based on the mistaken belief that plaintiff was providing information to the press about her employer's inadvertent eavesdropping).

The *Ambrose* court also noted that a protected speech case from the Supreme Court, *Waters v. Churchill*, 511 U.S. 661, 679 (1994), supported its conclusion because in that case the Court stated: "We have never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information." *Ambrose*, 303 F.3d at 495 (quoting *Waters*, 511 U.S. at 679).

Like the Third Circuit, the majority here also relies on *Waters*, albeit to reach the opposite conclusion. The majority asserts that *Waters* establishes that whether there was protected speech or conduct (the *Connick* test that is applied in protected speech cases) should depend on what the government reasonably thought was said rather than what, if anything, was actually said. Extending this proposition to the political affiliation context, the majority claims we should consider what defendants reasonably believed to be true about plaintiffs' affiliation with the Republican Party—even if the evidence does not include conduct establishing the existence of such an affiliation. But the majority's reading of *Waters* does not comport with that decision's underlying rationale, nor does the majority explain why a protected speech case (*Waters*) should govern the outcome in this political affiliation case.

In *Waters*, a nurse was fired by her government employer based on what the employer thought she said to some other nurses about regulatory violations and the poor quality of nursing care in the hospital. The employer conducted a thorough investigation into the alleged speech and concluded it was true. The discharged nurse admitted speaking on hospital policy matters, but denied making some of the statements attributed to her. After her termination and grievances, she filed a § 1983 action claiming her termination violated her First Amendment rights.

The Supreme Court plurality explained:

> [C]onstitutional review of government employment
> decisions must rest on different principles than review of

> speech restraints imposed by the government as sovereign. The restrictions discussed above are allowed not just because the speech interferes with the government's operation . . . Rather, the extra power the government has in this area comes from the nature of the government's mission as employer.
>
> * * * * *
>
> The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters*, 511 U.S. at 674-75.

Accordingly, the plurality concluded that a requirement that only the employee's actual speech can be considered in an employment decision was too rigid a test to satisfy the government's interest in efficient employment decisionmaking. *Id.* at 675. Thus, government employers should be given some leeway in deciding how to weigh differing versions of a conversation, who to credit, and how personal knowledge should play a role in the ultimate decision, even if the risk in these procedures was that the employer may erroneously punish protected speech. *Id.* at 676.

The deliberate effect of *Waters* is to give more deference to government employers' employment decisions. In stark contrast, the majority's application of *Waters* in this case makes it more difficult for the government to make employment decisions—including rudimentary changes in employment practices such as offering comp time. Yet, the majority here proposes extending *Waters* in just this way. The majority claims that what defendants reasonably believed about plaintiffs' affiliation

with the Republican Party—even if untrue—satisfies the protected activity element. On this basis the majority concludes that plaintiffs here engaged in protected conduct and that defendants' decision to take away the banked time system was motivated by that perceived conduct.[3]

The majority's reading of *Waters* is troubling for two reasons. First, by allowing a perceived affiliation claim such as the one here to go forward, the Court is essentially providing *more* First Amendment protection to government employees—specifically, the Court is extending First Amendment protection to government employees who have not even engaged in any actual conduct or speech. That result seems to be totally inconsistent with the *Waters* plurality's main justification that we should be giving deference to government employer's efficiency concerns in employment decision making.

Second, the majority does not explain why *Waters*, a protected speech case, should apply with equal force to a political affiliation case such as this one. In my view, even though this is not a political patronage case, any decision on the perceived affiliation issue should certainly take into account the governing principles in the Supreme Court's political patronage dismissal cases, *Elrod*, *Branti*, and *Rutan* (rather than protected speech cases such as *Waters*). Those cases deal directly with First Amendment protection of the right to political affiliation, and are thus a window into how the Court views such claims. We have previously used the political patronage cases to inform our decisions on whether plaintiffs engaged in protected affiliation activity for purposes of a retaliation claim. *See Sowards*, 203 F.3d at 432; *Eckerman*, 636 F.3d at

---

[3]The majority relies on *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1189 n.9 (6th Cir. 1995) as the authority for this Court's interpretation of *Waters*. But in that case, in contrast to the majority's conclusion, the Court's decision comported with the *Waters'* rationale of giving deference to employment decisionmaking. There, a basketball coach used the N-word with his players. He claimed it was a motivational tool. In addressing that argument, this Court stated, "[w]hat the First Amendment does not do, however, is require the government as employer or the university as educator to accept this view as a valid means of motivating players." *Dambrot*, 55 F.3d at 1190. Thus, the majority's reliance on *Dambrot* as an interpretation of *Waters* to be applied to the facts here is misplaced.

208.  In the patronage cases, the Court was not concerned about whether a category of speech was protected, but rather it was troubled by "the restraint . . . on freedoms of belief and association"— an issue that hews much more closely to the facts in this case. 427 U.S. at 355.  In all of those cases, there were affirmative restraints placed on the employee's ability to affiliate or remain unaffiliated, such as requiring a portion of wages to be given to a particular political party or requiring sponsorship from a party member.

Here, by contrast, defendants did not require plaintiffs Erskine and Pertunnen to pledge support for a party or seek a party sponsor.  Nor did defendants know, based on Erskine's and Pertunnen's conduct, that they were affiliated with the Republican Party. In fact, Erskine and Pertunnen denied engaging in any conduct that would have shown their affiliation with the party.[4]

In sum, the Supreme Court has not spoken on the precise issue here—whether an employer's mere perception of an employee's affiliation is sufficient to establish that the employee engaged in protected First Amendment activity.  By permitting this type of claim, the majority extends First Amendment protections to a context not previously recognized.  The majority's conclusion also seems contrary to the Supreme Court's rationale for addressing First Amendment claims involving government employers. Absent controlling law on this issue, I cannot conclude that plaintiffs Erskine and Pertunnen have satisfied their burden of showing they engaged in protected First Amendment activity.

Moreover, in my view, it was unnecessary for us to even decide this issue because none of the plaintiffs can satisfy the additional elements of a prima facie retaliation claim.

---

[4]*See supra*, note 1.

## II.

### A.  Dye's Protected Speech Claim

The majority concludes that the temporal proximity between Dye's speech and his demotion satisfies the causal-connection element of his First Amendment Claim. The majority grounds this conclusion on flimsy evidence that Dye's speech and his demotion actually occurred within two months of each other.

It is true that sometime between October 11, 2006 and November 8, 2006, defendant Post informed Dye that his position was being eliminated.  From this, the majority concludes that Dye's political speech with Post happened "[a]t the very earliest . . . on some date in September 2006."  The majority also acknowledges that there is no specific date in the record, but argues that because Dye was told about his demotion before November 8, 2006, the notice "must have occurred within two months, if not sooner, of the protected activity."[5]

The majority relies on a Title VII decision from this Circuit that concluded the causation element of a prima facie case was met based on temporal proximity alone where three months had lapsed.  *See* Ante (citing *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).  But this conclusion conflicts with a more recent decision of this Court.  *See Arendale v. City of Memphis*, 519 F.3d 587, 606 (2008) (affirming summary judgment for defendant and rejecting plaintiff's argument that retaliatory events occurring two months after an EEOC charge of discrimination were alone sufficient to establish temporal causal connection).

Even assuming the gap here was within two to three months, the majority also concedes that temporal proximity alone has its limitations and that "where some time elapses between when the employer learns of a protected activity and the subsequent

---

[5]At oral argument, the state conceded the discussion happened prior to the election, but could not state precisely when it occurred.

adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *See* Ante (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008); *see also*, *Arendale*, 519 F.3d at 606 ("Plaintiff claims that the fact that the retaliatory events occurred just two months after the EEOC charge of discrimination is enough by itself to support the causal connection element. This is simply a misstatement of the law. Absent other evidence of retaliation, Plaintiff's retaliation claim must fail.").

Given that the evidence is unclear as to precisely when Dye and Post talked politics and when Post informed Dye his position was being eliminated, and that in any event it is likely the gap in time is at the outside limits of what this Court has determined is acceptable, Dye should have been required to bring some other evidence of retaliatory conduct in order to establish the elimination of his position was based on his protected speech. But neither Dye nor the majority point to any other evidence, specifically as it pertains to the elimination of Dye's position. In this case, temporal proximity alone is not sufficient for Dye to establish causation. This conclusion is even more clear when considering defendants' proffered reasons for eliminating Dye's position.

The majority discusses that defendants' eliminated Dye's position for budgetary reasons and that certain of Dye's functions were being reassigned to Post. Yet, the majority ultimately determines that defendants' evidence is not sufficient to conclude that no reasonable juror could fail to return a verdict for defendants. But the majority's discussion of the evidence in this case is incomplete.

The opinion neglects to mention that Dye knew as early as June or July of 2006 that his job responsibilities were being diminished. This was several months before he engaged in any protected activity. Dye's reduced responsibilities (and the eventual elimination of his position) is completely consistent with defendants' claims that budgetary concerns required examination of how staff were being used and that there

was not enough work to justify the continued cost of the position.[6] (Post. Aff. ¶ 8, Page ID #297-98). This in turn is consistent with the precipitous decline in race dates and revenues during this time period, (Post Aff., Exhibit 3, Page ID #307), culminating in drastic budget cuts in 2007, 2008, and 2009. (Post Aff. ¶ 14-15, Page ID #302).

The fact that Dye's position was eliminated because of budget issues is also supported by Post's decision to add Dye's job responsibilities to his own, and that defendants did not hire someone new to fill Dye's Administrative Liaison role. (Dye Dep., Page ID #318).

This evidence belies the majority's conclusion that Dye established causation here simply by asserting an imprecise and attenuated connection between his political speech and the elimination of his position. Instead, when contrasted with Dye's feeble causal nexus, this evidence compels the conclusion that no reasonable juror could fail to return a verdict for defendants.

**B. Dye and Hall's Affiliation Claims**

For the reasons discussed above, in my view, only Plaintiffs Dye and Hall may be able to satisfy the protected activity element of their political affiliation claim on the basis that their conduct may be enough to establish that defendants believed Dye and Hall were affiliated with a political party.[7] *See Sowards*, 203 F.3d at 432 ("Support of a political candidate falls within the scope of the right of political association."). That said, Dye and Hall would also still have to establish that elimination of the banked time system was an adverse action and that defendants took that action at least in part because of Dye and Hall's affiliation with the Republican party.

---

[6]The majority also fails to wrestle with Dye's own testimony on what the costs of his position were, including discrepancies regarding Dye's salary, the fact that Dye had a state car, a gas card, a state-issued phone, and that the state paid his expenses for overnight stays and meals. (Arg. Audio at 23:20; Dye Dep., Page ID #316).

[7]Even if Erskine and Pertunnen could satisfy the protected activity requirement, as the subsequent analysis shows, their claims would fail on the other elements.

The district court concluded elimination of the banked time system was not an adverse employment action because plaintiffs would still continue to be paid for each work day. The majority comes to the opposite conclusion.

In *Adair v. Charter Cnty of Wayne*, 452 F.3d 482 (6th Cir. 2006), this Court addressed the argument that a freeze on the use of banked time was an adverse employment action for purposes of a retaliation claim under the Fair Labor Standards Act. We held that the freeze on banked time was not an adverse action because it "did not result in a material loss of benefits, termination, demotion, transfer, or alteration of job responsibilities." *Id.* at 490. Rather, defendants merely required plaintiffs to use vacation days for vacation rather than save it for pay at a later date. *Id.*

The majority here asserts that *Adair* is only of limited instructional value because of the "distinct standard" applied to First Amendment retaliation claims where the question is whether the alleged action would "deter a person of ordinary firmness from exercising the right at stake." *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc). Applying this standard, the majority concludes that here the banked time program "was a key benefit to these stewards," and "[a]lthough White and Post changed the structure of the compensation in a way that would not inflict any potential monetary losses, it certainly imposed a different type of financial burden on the stewards. The lack of a steady income, especially when combined with the decrease in racing days, could certainly chill or silence a person of ordinary firmness."

This conclusion is not warranted by how the banked time system actually worked. The system allowed the Harness Stewards to essentially "bank" days they worked over the regular ten days in any 14 day period. Thus, if a steward worked 11 days in two weeks, that steward could put one day in the "bank" to use at a later time, for example to fill in for missed days in a later pay period if he or she took time off. When defendants eliminated the banked time program, they still allowed plaintiffs to use any accumulated time until it ran out, and plaintiffs would still be paid for any days

worked over their ten regular days, but they simply could no longer bank those days for later use. The fact that plaintiffs still get paid for any days worked over ten days cuts against the majority's conclusion that elimination of the banked time system resulted in a "lack of a steady income," which "when combined with the decrease in racing days, could certainly chill or silence a person of ordinary firmness."

Even after the system was eliminated, plaintiffs were still permitted to use time they had banked until it ran out. Additionally, plaintiffs could still work additional days over the regular ten and get paid for it. The only real difference is that plaintiffs would be personally responsible for saving the money from that extra day of work instead of having the state hold onto it for them. In other words, rather than having the state "bank" plaintiffs' rainy day funds, plaintiffs themselves would be required to deposit the money into a savings account or put it into an envelope and use it when they needed it.

Plaintiffs' complaints regarding elimination of the banked-time system amount to nothing more than purely personal reasons for preferring a former state of affairs over the current state of affairs, which this Court has stated in the Title VII context does not constitute an adverse action. *See Strouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 343 n.2 (6th Cir. 2001); *see also Smith v. Cnty. of Hamilton*, 34 F. App'x 450, 456 (6th Cir. 2002) (concluding loss of opportunity for compensatory time was not adverse employment action under Title VII). Essentially, as contract employees, the only thing plaintiffs here lost was the state's willingness to hold onto their extra pay when they wanted to take a day off or when there was no work. Now *they* would be responsible for that. This hardly seems to be the type of loss that would deter a person of ordinary firmness from affiliating with a political party.

Moreover, even assuming the loss of banked time was an adverse action, Dye and Hall would still have to show the system was eliminated because of their political affiliation and that defendants' stated reasons for eliminating the system do not support the conclusion that no reasonable juror could fail to return a verdict for defendants.

Dye and Hall's best evidence of causation are defendants' alleged statements that they were eliminating banked time because of plaintiffs' support for the Republican candidate in the previous gubernatorial election. Even though these statements go to the causation element, when considered alongside evidence that defendants did not just eliminate the banked time system for plaintiffs but they also eliminated it for two other Harness Stewards who were not a part of this lawsuit, the causal connection is not so clear. Additionally, defendant White denied ever making a statement that she eliminated the banked time system because of plaintiffs' political affiliations. Even though at the summary judgment stage we view the evidence in the light most favorable to the non-moving party, this other evidence at the very least creates some doubt about plaintiffs' claim that defendants eliminated the banked time system because of plaintiffs' Republican affiliations.

This conclusion is even more questionable when defendants' reasons for eliminating the banked time system are considered. White testified that she consulted with the Department of Agriculture's Human Resource Director "soon after [White] learned of the banked days," and that the Director informed her that the banking system was a liability for the Agency. The Director told White that because plaintiffs were contract employees and not entitled to sick leave or annual leave, they should not be getting banked days to use for that purpose. White relied on this advice when she decided to end the practice, and because she had consulted with the Director, she did not consider her decision to be discretionary.

Defendant Post's testimony corroborates White's assertions. He testified that he and White were concerned about the lack of oversight and accountability with the "banking" process, and that after consulting the Department of Agriculture's Human Resource Director, the decision was made to eliminate it because it was not governed by any written policy or Civil Service rules, it was not used by any other types of racing stewards, and there was no management or oversight of the process.

Plaintiffs allege that at the January 2007 meeting, White said the banked time was being eliminated because of plaintiffs' perceived affiliation.  But when that alleged statement is stacked up next to evidence that the system was eliminated for all of the Harness stewards not just plaintiffs, that White testified she did not make those statements at the January meeting, that White and Post were concerned about the lack of oversight and thus consulted with the Director of the Department who told them the practice should cease, and that White did not consider her decision to be discretionary, it seems clear that no reasonable juror could fail to return a verdict for defendants with respect to whether their decision was politically motivated.

**III.**

For the foregoing reasons, I disagree with the majority's conclusions on these issues and would therefore affirm the district court's decision to grant defendants' summary judgment motion.